THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ODIS CARTER *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 78-184

Opinion filed June 20, 1979.

Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Rimas F. Cernius, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

Defendants Odis Carter and his friend Roy L. Carter appeal their convictions at a joint jury trial of armed robbery and burglary, and their sentences of 10 to 20 years.

The complaining witness, Robbie Taylor, testified that the crime was perpetrated by someone calling himself Lucky and by two other men. The main issue at trial was identity: the State asserted, and the defendants denied, that Odis Carter and Roy Carter were those men. The defendants were identified as the criminals by three eyewitnesses. In addition, the State's witnesses identified the car the defendants were found in when apprehended as the one used by the criminals. The defendants attacked all this evidence as unreliable, and offered an alibi.

The defendants argue, among other things, that certain conduct of the assistant State's Attorney during closing arguments so hampered their efforts to impeach the identification evidence as to deny the defendants a fair trial. We agree. To put the prosecutor's misconduct in context, and demonstrate its importance, we survey this evidence at some length.

Robbie Taylor shared the burglarized apartment with her sister, Carolyn Settles. Settles and her boyfriend, James Overs, arrived at the apartment building while the crime was in progress. Overs testified that the criminals drove a 1969 Buick Electra 225, brown with beige top, with a Cancer zodiac sticker on the rear window. He was able to read the first three numbers of the license plate, 799. The defendants were stopped shortly after the crime in a car of this year, make, and color, with 799 as the first three digits of the license plate. It had a zodiac sticker in the rear window. The State's witnesses said this was a Cancer sticker, displaying both the word "Cancer" and the symbol of that sign; but Odis testified it was a Capricorn sticker, and the defense produced Frederick Grant, who testified he owned the car, and the sticker was for Capricorn. None of the stolen property was in the car when it was stopped.

The evidence relating to the description of the car was strong. Even by itself it might support a conviction. It was not, however, so overwhelming that the jury must have convicted even without the testimony of the eyewitnesses who identified the defendants personally. Overs testified that when he first saw the car there were two men in it; but he admitted he had earlier said there were three, and, as we shall see, there are grounds for believing that there was only one occupant at that time. If Overs was wrong

about this, he could be wrong about the car itself. There was a dispute over the window sticker, and without that there is some chance of a coincidence. The defendants presented contrary testimony. We conclude, therefore, that the eyewitness identifications could well have been critical.

The identity witnesses were Robbie Taylor, Carolyn Settles, and James Overs. Taylor saw the criminals for only a short time, about 15 seconds, plus perhaps another 15 seconds in the case of the man she identified as Odis, when, so she testified, he tied her up. The witness admitted, however, she had earlier told the police that Lucky had tied her up, without mentioning that anyone assisted him. If one of the other men did help, he worked from behind, while Lucky held a knife to Taylor's throat. Because the crime took place around 11:30 p.m., after Taylor had gone to bed, there were no lights in the room, only some light from adjoining rooms. Robbie Taylor told the police that the men were about 19 to 22 years old; both Odis and Roy were over 30.

Settles testified that she saw Roy in the back seat of the car while it was parked outside the Taylor-Settles apartment. She did not get a good look at him. She did not notice anyone else in the car at that time. She identified Odis from having passed him on her way up, and noticed him carrying her property. When she got to the apartment, Lucky was just leaving; in other words, he was the last of the three robbers to go down to the car.

Overs testified that he saw two people in the car initially: an unidentified man in the front seat, and Roy in the back. He got a good look at Roy's face because Roy kept turning around to look at Overs. He also noticed a spot without hair on the man's head; Roy had such a spot. Overs then passed someone carrying a stereo and albums; Overs identified this man as Odis. Since according to Settles' testimony Lucky was still in the apartment while Odis was carrying the stolen property to the car, the man Overs claims to have seen in the front seat would be a fourth man, who did not participate actively in the crime, and who has never been identified or described in any way.

When the police arrived, Overs said he thought he could identify the car and the men. The policemen asked him to go with them in the squad car while they drove around the area. They did this for a while without success, and then drove Overs back to the apartment. Shortly afterward, the police spotted a car matching Overs' description, so they picked him up again. As they drove, Overs saw a beige and brown Electra 225, standing near a police squadrol, and said that was the car. He identified two handcuffed men as the criminals. The police thereupon placed the men, who were Roy Carter and Odis Carter, in the squadrol, and took them to the building where the robbery occurred. The police told Taylor they thought they had caught the criminals, and asked her to go downstairs and see if she could identify the suspects. Standing together, and in Overs' presence, Taylor

and Settles identified the defendants as the criminals. The defendants were the only people in the squadrol, and wore handcuffs.

Before trial, the defense moved to suppress the identifications as unduly suggestive. The court denied the motion.

In closing argument, defense counsel assailed the identification procedure as biased and untrustworthy:

> "Lo and behold, who is in the paddy wagon? Odis Carter and Roy Carter. * * * It is pretty obvious they might be handcuffed. Who do you think the complaining witness identifies? There is nobody else to choose from in this—"

> "I ask you, how many people were in that paddy wagon? There were two people to choose from, Roy Carter and Odis Carter. And they are handcuffed in that paddy wagon. It is hardly what you would call a fair situation * * *. It is hardly a line-up. Shouldn't there have been a line-up?"

> "[S]he is standing out there with James Overs and Carolyn Settles. Each influencing each other, subtly * * *. It is not an independent test. Let me put it this way, ladies and gentlemen, don't you think that Carolyn Settles should have been separated from James Overs when Carolyn looked inside that paddy wagon?"

The prosecutor objected to each of these comments. He asserted, with the jury present, that "This Court has ruled it was a proper procedure"; "This Court has ruled that the procedure was constitutional"; and "The Court has already ruled in pre-trial—." The defense objected to these statements. In the State's rebuttal argument, the prosecutor insisted, at length, over repeated objections, which were sustained, that the court had already ruled the identification procedure proper. For example: "Well, there are some people that would make you want to think that this was done improperly and in a reasonably suggestive manner. * * * [L]et's put it this way, it's already been suggested to this Court that it was."

■■ Beyond dispute, defects in identification procedures are proper matters for the jury to consider, and a defendant has the right to argue the issue. The court had never suggested otherwise; its pretrial order ruled the evidence constitutionally and legally admissible, not unimpeachable. Indeed, the constitutionality of flawed identifications has been expressly predicated on the good sense of juries, who can measure intelligently the weight of questionable identification testimony. *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.

■■ The State's position, however, is that the defense was, improperly, attacking the *legality* of the procedure, and thereby invited and justified the prosecutor's response. This interpretation of defense counsel's argument is strained. As we read the record, the defense was attacking not the legality of the procedure, but its factual reliability, the weight of the

evidence. The defense argument was therefore above reproach. It was the prosecutor's tirade, beginning, "Ladies and gentlemen of this jury, the law in this state \* \* \*" that confused and blurred the distinction between law and fact. By telling the jury, over and over again, in every possible way, that the court had already decided this now entangled issue, and decided that the identification procedure was unexceptionable, the prosecutor communicated to the jury that they ought not to consider seriously the inherent weaknesses of the identifications, but ought rather to accept them at face value, unquestioned. In fact, the jury could easily conclude that they had no legal choice but to do so. The State thereby denied the defendants any real trial, for the essence of a trial is that evidence is weighed.

If the assistant State's Attorney had not erred as he did, the jury might have discounted the eyewitness identifications heavily. They might then have acquitted the defendants. Accordingly, we reverse, and remand for a new trial.

■■ We note that there is another possible objection to defense counsel's closing argument, likely to emerge more clearly on retrial. Counsel pointed out the weaknesses of the procedure the police employed by mentioning better methods, and suggesting they should have been used. This is a natural rhetorical device; but one might argue that such comments are irrelevant and prejudicial, in that the reliability of the method used is unaffected by the alternatives available, and mention of the alternatives therefore serves only to inflame the jurors by leading them to believe the police were sloppy or cunning. The trial judge may have had something like this in mind when he said, "What was not done is not in evidence." Clearly, however, the prosecutor did not make this objection. Even if he had, it could not have excused his improper statements, for the court never actually ruled on this point. Moreover, we feel that this objection also is unsound. One *can* reasonably draw some adverse inference from the use of an inferior method when a superior was readily available. In the course of an argument that the method used was flawed, counsel should not be restricted from comparing that method with others that the evidence showed were not used. The defense here was discussing the evidence. Counsel never suggested that the police had done anything illegal, immoral, or improper, or anything else not in evidence.

Next, the defendants claim that several other strands of the State's closing argument were improper and denied them a fair trial. We discuss two issues likely to arise again on retrial.

■■ First, the prosecutor stressed that a witness the defense said would support its alibi never appeared. It has long been held that comment upon the defendants' failure to produce an alibi witness, as opposed to other sorts of witnesses, is proper. (*People v. Garnett* (1969), 113 Ill. App. 2d 159, 251 N.E.2d 761.) The defendants distinguish the present case on the ground

that the alibi witness was first mentioned under cross-examination. We do not see how that makes any difference. The defendants quarrel particularly with the prosecutor's sarcastic "I have got the man. This man will prove me innocent. I just talked to him." It is true that the defendants did not say precisely this; but the prosecutor never suggested that this language was a quotation. It was obviously just rhetoric. The words may seem to cast the burden of proof on the defense. But, in context, we do not think the jury could have understood them so. The prosecutor's immediately preceding sentence was, "They don't have to prove it." The judge sustained the defendants' objections and reminded the jury that "closing arguments are only natural inferences [from the evidence]." The jury heard the normal instruction on burden of proof.

Comment on absent alibi witnesses is permitted precisely because an especially strong inference is reasonable where the defense fails to call a witness who could prove the defendant innocent, and whom the State cannot reasonably be expected to call. The most favorable testimony such a witness (here a bartender) could be expected to give for the State would be a blank memory. The State is not required to subpoena the world to prove that nobody saw the defendants innocently engaged. We interpret the prosecutor's statements here as simply pointing out a proper inference, not as shifting the burden of proof.

■■■ Second, the defendants challenge the prosecutor's attack upon the truthfulness of a defense witness who corroborated Odis' testimony about the car. The prosecutor was entitled to comment on the credibility of the witnesses; the evidence supported an inference that the witness lied, and the prosecutor could say so. The only indefensible point the prosecutor made was his remark that "You can tell a lot about the * * * defendants by their friends." This statement was improper, as asking the jury to convict the defendants for their associations instead of their guilt.

Because we reverse on other grounds, we do not believe it necessary to discuss the other errors the defense points to in the State's closing argument, or consider whether the cumulative effect, the gratuitous invective, the unceasingly inflammatory tone of the prosecutor's argument, and the way he continually defied the rulings of the trial judge, would compel reversal.

Similarly, we do not address the defendants' contention concerning the venireman's remark that he thought he recognized the defendants as former inmates of the Cook County Jail, since we assume the remark will not be repeated at a new trial. We also refrain from passing on the propriety of the sentences imposed.

The convictions are reversed, and the case remanded for a new trial.

McNAMARA and McGILLICUDDY, JJ., concur.