## JAMES MONROE HENDERSON *v.* STATE OF MARYLAND

[No. 818, September Term, 1981.]

*Decided March 4, 1982.*

The cause was submitted on briefs to GILBERT, C. J., and MORTON and MASON, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Michael R. Malloy, Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Stephen B. Caplis, Assistant Attorney General, William A.*

*Swisher, State's Attorney for Baltimore City,* and *Mark P. Cohen, Assistant State's Attorney for Baltimore City,* for appellee.

GILBERT, C. J., delivered the opinion of the Court.

On September 16, 1980, the Court of Appeals decided *Eley v. State,* 288 Md. 548, 419 A.2d 384 (1980).[1]

*Eley* mandates that if the State does not produce possible other relevant evidence or explain its failure to produce that evidence, the defendant is permitted to comment to the fact finder on the State's shortcoming. The clear purpose of comment by the defense is to create an inference that had the State introduced the non-produced or non-explained missing evidence, the introduction would be beneficial to the defendant. *Ergo,* the defense would probably assert that the State, put to the choice of producing evidence helpful to the accused or ignoring such evidence, would opt for the latter. Such an argument might well convince a jury that there is a reasonable doubt of the defendant's culpability.

The message sounded by *Eley* is clear: Possible relevant evidence not introduced, or its absence explained, may be used against the State.

In *Eley* the defendant was charged, *inter alia,* with assault with intent to murder a Mr. Johnson and of robbing Ms. Ada Jones of her car. There was testimony that Eley took the Jones' vehicle and drove from the crime scene. The vehicle was recovered the next day. The State at trial did not introduce any evidence concerning Eley's fingerprints being found on or about the Jones' automobile. For that matter, fingerprints were apparently not mentioned until defense counsel proposed, in his closing argument to the jury, to allude to the absence of fingerprint evidence. The trial judge refused to allow that argument. Eley was convicted. On appeal to this Court, the judgment was affirmed in an

---

1. *Eley* was decided by a divided Court. Chief Judge Murphy dissented with Judge Rodowsky joining therein.

unreported per curiam opinion.[2] The Court of Appeals granted certiorari and reversed.

The majority quoted with approval *People v. Carter,* 73 Ill. App. 3d 406, 392 N.E.2d 188 (1979).[3] There, identification was made of two handcuffed persons immediately after a robbery. There was no line-up. Defense counsel asked the jury, "Shouldn't there have been a line-up?" The prosecution objected and in the presence of the jury exclaimed that " '[t]his Court has ruled . . . [the identification] was a proper procedure.' '[T]his Court has ruled that the procedure was constitutional,' and '[t]he Court has already ruled in pre-trial.' " The defense objected to those remarks. The appellate court, while reversing on other grounds, commented:

> "One *can* reasonably draw some adverse inference from the use of an inferior method when a superior was readily available. In the course of an argument that the method used was flawed, counsel should not be restricted from comparing that method with others that the evidence showed were not used. The defense here was discussing the evidence. Counsel never suggested that the police had done anything illegal, immoral, or improper, or anything else not in evidence." 73 Ill. App. at 410, 392 N.E.2d at 192. (Emphasis in original.)

There was evidence in *Carter* that the defendants were apprehended almost immediately after the commission of the crime. They were taken in handcuffs to the place where the crime occurred. A victim was told by the police that "they thought they had caught the criminals, and [the victim was] asked . . . to go downstairs and see if she could identify the suspects. . . . The defendants [whom she identified] were the only people . . . [in] handcuffs." The *Carter* Court could and

---

**2.** Eley v. State, No. 1039, September Term, 1978, filed September 17, 1979.

**3.** In addition to *Carter,* the Court of Appeals cited an Alaska decision, Jacobson v. State, 551 P.2d 935 (Alaska 1976).

did readily conclude that the identification procedure was in evidence.

*Eley* [4] steps beyond *Carter.* There was, as we have said, no evidence introduced at Eley's trial concerning fingerprints. There was, however, evidence that Eley had fled in a victim's vehicle; but whether Eley was wearing gloves, wiped his fingerprints from the car, or the police simply did not "dust" the car for fingerprints is left unstated. The failure to produce evidence of fingerprints or explain the reason for not producing the "prints" proved to be the prosecution's Achilles' heel because the *Eley* Court held: The *"unexplained* silence concerning a routine and reliable method of identification especially in a case where the identification testimony is at least subject to some question . . . is within the scope of permissible argument. . . ."

The instant case involves, *inter alia,* what might be termed an inverse application of *Eley.* We explain.

The appellant, James Monroe Henderson, was charged with murder, robbery with a dangerous and deadly weapon, and the usual related counts. At a jury trial in the Criminal Court of Baltimore, Judge Marshall A. Levin, presiding, Henderson was convicted of felony murder, robbery with a dangerous and deadly weapon, and two counts of the use of a handgun in the commission of a crime of violence. To avoid any possible confusion, it should be understood that the murder victim was not the same person who was robbed.

Prior to the actual trial, the appellant asked Judge Levin to grant a motion *in limine* so as to preclude the State's offering evidence showing that appellant was residing at a prerelease center at the time of arrest. Judge Levin, in granting the motion, instructed the State not to introduce evidence that the appellant was apprehended at a prerelease

---

4. *Eley* follows one approach to this problem. For a *contra* view *see:* Jordon v. State, 267 Ala. 361, 102 So.2d 4 (1958); State v. Terry, 472 S.W.2d 426 (Mo. 1971), *vacated as to sentence and remanded for imposition of proper sentence,* 408 U.S. 940 (1972); Commonwealth v. Wright, 255 Pa. Super. Ct. 512, 388 A.2d 1084 (1978); U.S. v. Wilkins, 422 F. Supp. 1371 (E.D. Pa. 1976), *aff'd,* 601 F.2d 578, *cert. denied,* 444 U.S. 877 (1979); State v. McKinney, 554 S.W.2d 488 (Mo. Ct. App. 1977).

center. The judge, however, cautioned defense counsel that, "if the Defendant opens the door, then I am not going to preclude the State from having a fair shake, so to speak. So, all I'm saying now is that it can be brought out that . . . [appellant] was arrested . . . and that there can be no mention of rehabilitation or any other indication that Mr. Henderson has a criminal record. . . . [Nevertheless,] if . . . [the defendant] open[s] the door, . . . [he is] liable to cause . . . [this] ruling to be different."

The State proved that the murder victim was shot to death, that a robbery was committed with the use of a handgun, that a gun was seen in the hands of the murderer-robber and that appellant was arrested at 902 Greenmount Avenue. No State witness mentioned that the prerelease center was located at that address.

The defendant-appellant, in his presentation of evidence, asked Detective Lawrence O'Brien of the Baltimore City Police Department: "During the course of your investigation, has the weapon been recovered?" The detective responded, "I have not recovered any weapon." The defense continued by asking, over objection, whether there was "any tangible evidence" such as fingerprints, foot prints, or any "other kind of . . . tangible evidence . . . which . . . [may have] been recovered from the crime scene." The detective answered, "Not to my knowledge."

Those questions alerted the State to the defendant's possible reliance upon *Eley* when the time for closing argument arrived. Consequently, the State asked to be allowed to establish that a search of the place where appellant was arrested was not conducted because of the improbability of carrying a weapon into the prerelease center. Over the strenuous objection of the appellant, Judge Levin permitted the State to inquire as to the place where appellant was apprehended. The judge observed: "[I]t was unnecessary for the defense to bring out an undisputed fact by putting on the witness" and asking about the non-recovery of the gun. We think it transpicuous that the appellant sought to give himself an "*Eley* edge" with "the State powerless to counteract that advantage. . . ."

The appellant asserted that his inquiry about the recovery of the murder weapon did not open the door to the State's use of the fact that appellant was arrested at the prerelease center. In any event, Judge Levin allowed the State to ask Detective O'Brien where the arrest of appellant was made and whether a search warrant was obtained in order to "look for the gun." O'Brien said that appellant was arrested at the prerelease center, and that no warrant was obtained because he "felt it would be futile to" conduct a search of the Center.

Judge Levin then almost immediately instructed the jury:

> "[T]he reference to where the Defendant was arrested, you will not consider ... as being significant at all, the place where he was arrested and the nature of the place where he was arrested, that should not enter into your viewpoint or deliberations."

We think Judge Levin properly allowed the State to educe testimony as to why the murder weapon was not located and presented at trial. Although appellant disavows any intent "to show that Detective O'Brien had not aggressively investigated the case," *Eley* would have allowed such an argument had appellant advanced it to the jury. Even considering appellant's assurance that there was no intention "in closing argument to say whether or not the police did anything wrong in their investigation in the matter," the inference to be drawn from Detective O'Brien's testimony was clear. Judge Levin explained that the examination extracted a "suspicious motive or suspicious fact" from which the jury could have inferred that the police were "less than aggressive in pursuing [the] case ... because if there was a gun, the detective should have gotten a search warrant and searched the [appellant's] premises for that gun." Judge Levin, as with all trial judges, is not permitted the luxury of hindsight when he is called upon to rule during a trial. Based on what was then before him, and cognizant of *Eley,* he took the appropriate measure to assure that the State was not treated unfairly.

We note that the evidence elicited from Detective O'Brien had no real bearing on establishing the criminal record, if any, of the appellant. The testimony did not reveal that appellant was a resident of the prerelease center. He, on the basis of that testimony, could have been there as a visitor, employee, or there in a variety of other capacities.

At trial, the robbery victim made a positive in-court identification of appellant and testified that appellant had brandished a "nickle-plated .38 . . . brown [handled], snub nose revolver." The State also produced a witness who knew appellant and placed him at the scene of the robbery and murder. As we see it, even if the trial court committed error, it was harmless beyond a reasonable doubt. *Bartram v. State,* 33 Md. App. 115, 153, 364 A.2d 1119 (1976), *aff'd,* 280 Md. 616 (1977).

## II.

Appellant next asserts that the trial judge erred in the "manner of questioning defense witness James Smith."

The record reflects that the witness testified that he had seen the murderer-robber. He described the culprit as having a "thick mustache," "real bushy like; sideburns," "a light skinned fellow," "about six-two or maybe six-three, and he was real skinny."

It was developed in the testimony that Smith was a friend of the appellant's cousin, and although he had seen photographs of the appellant as supplied by the cousin, he had never seen appellant before the trial. Smith said that appellant was not the person who committed the crime. Significantly, we think, the witness had no idea how tall the appellant was because he had only seen him in a seated position.

Judge Levin asked the witness a number of questions including, "But, you don't know how tall this Defendant is, do you?" Counsel for the appellant objected to the court's "impeaching the witness." The judge responded that, "I

think the judge must be interested in justice and bring out before the trier of fact those things which are mentioned. It is in that spirit that I have attempted to bring out some evidence from this witness. I am not trying [the case] for the defense and I am not trying [it] for the State. I am trying to bring out before the trier of fact enough facts so that they will have a reasonable opportunity to reach a just verdict."

Appellant argues that it was improper for the judge to "cross-examine" the witness in a manner that conveyed to the jury that the judge disbelieved the witness. From our reading of the record, the questioning by Judge Levin did not convey to the jury that the judge disbelieved the witness. We observe no impropriety.

Approximately thirty-seven years ago, Judge Learned Hand explained that "a judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *United States v. Marzano,* 149 F.2d 923, 925 (2d Cir. 1945); *Patterson v. State,* 275 Md. 563, 580, 342 A.2d 660, 670 (1975).

The line between adjudicator and advocate may sometimes be indistinct, but we are satisfied that, while Judge Levin was not "inert," he did not cross the line. We perceive no transgression in his inquiries directed to the witness, Smith.

### III.

Lastly, appellant finds error in the judge's instructions to the jury. Appellant asseverates that Judge Levin "did not make sufficiently clear that a not guilty verdict could be rendered." We have carefully read the instructions to the jury and observe that during the course of them, the judge said:

"In these cases, as well as in any other criminal case, the burden of proof is on the State to prove every element of the crimes charged against this man. Therefore, I say to you that he is presumed

innocent until proved guilty beyond a reasonable doubt. This presumption stays with him throughout the entire trial until overcome by proof establishing his guilt beyond a reasonable doubt and to a moral certainty. He is entitled to every inference in his favor which can reasonably be drawn from the evidence.

. . . .

Now, let's recapitulate. As to Robert Herman Brown, your verdict can be as follows: You can find him guilty of robbery with a deadly weapon, first count. If so, ignore robbery. And you can also find him guilty of the eighth count, use of a handgun. *Or you can find him not guilty of all of it. Okay?*

Now, let's go to William Moore, the murder charge. You can find him guilty of murder in the first degree, premeditation and deliberation. If so, ignore second degree murder, and first degree murder, felony murder.

Then come to the second count, which is use of a handgun.

So, understand that theoretically you can find him guilty of first degree murder and use of a handgun or you could find him guilty of second degree murder, use of a handgun, or you could find him guilty of felony murder and use of a handgun, *or you could find him not guilty of everything.*

. . . .

. . . [I]f you were to find this man guilty, it becomes the important function of this Court to dispose of the case. I know that you can consider your function accordingly, and I consider mine seriously, too, but you should not be concerned with anything except whether this man is guilty or innocent, and the rest is — and I say this with no offense — it is not your affair.

Now, then, I tell you that your verdict must be unanimous." (Emphasis supplied.)

The instructions read as a whole clearly informed the jury that they could find the appellant "not guilty." Moreover, the written verdict sheets that Judge Levin distributed to the jury provided for the jury's finding of a not guilty verdict should they have been so inclined. Manifestly, the jury was not of the belief that the State had fallen short in meeting its burden.

> *Judgments affirmed.*
> *Costs to be paid by appellant.*