BEVERLY J. DOUGLAS A/K/A BEVERLY COOPER
*v.* STATE OF MARYLAND

[No. 1220, September Term, 1975.]

*Decided July 23, 1976.*

The cause was argued before MENCHINE, LOWE and MELVIN, JJ.

*Orrin J. Brown, III, Assigned Public Defender,* for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Wehland, State's Attorney for Howard County,* and *Dwight Thompson, Assistant State's Attorney for Howard County,* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

Beverly J. Douglas was first tried in the District Court of Maryland for Howard County on a warrant for grand larceny. She was charged with having stolen $136.18 from Safeway Stores, Inc. in Ellicott City where she was employed as a food clerk and cashier. Witnesses were sequestered and admonished "not to discuss the matter with anyone."

During the testimony of the first witness, the manager of the Safeway Store at which the theft allegedly occurred, it was elicited that he had reported to his supervisor "what had occurred" regarding a missing check in the amount of $136.18, and that the two had then jointly interrogated Douglas. Immediately before a recess of the trial, the court cautioned the manager, Mr. Eades:

"Mr. Eades, you stopped in the middle of testimony. You're not to discuss your testimony with anyone until counsel and I decide. With anybody, you understand? You're still on the witness stand and I think no further warning is necessary. You want to bring those other people in from outside? All right, the Court is going to recess until 1:30 and you'll be required to return at that time. Of course, I just want to warn you that you've all been sequestered and you won't discuss the testimony with anyone, or talk about the case, on your lunch time."

At the conclusion of his testimony, Mr. Eades was again addressed by the court:

"Thank you, Mr. Eades, you'll have to absent yourself during the rest of this particular case. You're not to discuss your testimony with anyone until — or the case — until the entire matter is disposed of."

Following testimony by other State witnesses, the supervisor of the store, Mr. Larry Dogra, was called. The direct examination of this witness was interrupted by appellant's counsel who requested a recess to inform the

court of a violation of the sequestration order by Eades and Dogra which had just come to his attention. At the conclusion of Dogra's testimony, David Johnson, Esquire, was called by the court and testified as to what he had observed outside of the courtroom. Speaking of Dogra and Eades, he noted that:

> "These two gentlemen were sitting inside the building, on the bench against the far door, all the way back in the corner. This gentleman was sitting against the door, this gentleman was sitting next to him, very closely, and they were discussing the case."

He then was asked to relate what he had overheard, to which he replied:

> "I overheard the — Mr. Eades, is it, in the brown shirt — say to the other gentleman, well, if we can't prove that the hundred and thirty-some dollars — and I don't recall what the amount of the check was, was taken — we're in a lot of trouble, and the other gentleman, as best as I can recall, said, but we can prove it, and then he opened up what appeared to me, and I just briefly scanned out of a notebook some kind of piece of white paper. He started enumerating some figures and subtraction and, of course, I was in the process of walking and I walked on out through the door and that's — when I came back — I then made a point to come back and the gentlemen were still discussing matters, but I do not specifically know what they were discussing when I came back."

Eades was then recalled by the State and testified to an innocuous conversation with Dogra, admitting only an insignificant reference to the case:

> ". . . let me see — the only things that were said, he asked me if — did we threaten her that night and I said, not that I can recall, anyway, we're not

supposed to talk about it, and that was it, pertaining to the case."

At the conclusion of this testimony, the State rested its case, presumably its entire case, whereupon, appellant moved for dismissal arguing that there had been no evidence that the $136.18 had been taken. The court responded somewhat indirectly:

"Quite frankly, Mr. Sadler, [defense counsel] the Court's of the position that — it's got in the position of determining credibility and so forth. It couldn't under the posture of the case do it in fairness. The Court, on it's own motion, declares a mistrial."

Thereafter, appellant prayed a jury trial, thereby transferring jurisdiction of her case to the Circuit Court for Howard County. She then moved that court to dismiss the charge against her on the ground of double jeopardy. Upon denial of that motion, she appealed immediately to this Court pursuant to *Neal v. State*, 272 Md. 323.

We reverse the denial of Douglas' motion to dismiss. A mistrial should be granted only when there is a "manifest necessity for the act, or the ends of public justice would otherwise be defeated." *The United States v. Perez*, 9 Wheat. 579, 580. We are not disposed to consider the trial judge's concern over the credibility of the State's witnesses to be a circumstance of "manifest necessity." Such observations are an important ingredient of judicial decisions.

In *Baker, Whitfield & Wilson v. State*, 15 Md. App. 73, 89, Chief Judge Orth analyzed the holdings of the Supreme Court in *Perez, supra, Gori v. United States*, 367 U. S. 364 and the divergent views of the Court expressed in *United States v. Jorn*, 400 U. S. 470. The conclusion reached by Judge Orth for this Court was:

"We are convinced, and so find, that the rule representing the opinion of a majority of the Supreme Court is that the question whether retrial following a *sua sponte* judicially declared mistrial without the defendant's consent is prohibited by

the double jeopardy clause of the fifth amendment is to be resolved by a determination whether the mistrial declaration was an abuse of judicial discretion. We are satisfied that 'abuse of judicial discretion' is to be assessed by the manifest necessity standard of *Perez* as explicated by *Gori*." 15 Md. App. at 89.

More recently the Court of Appeals, through Judge Eldridge, has provided a virtual alembic of decisions, further distilling the test to be applied in assessing the exercise of judicial discretion in declaring a mistrial. In *Cornish v. State*, 272 Md. 312, an important guide was emblazoned upon our test for determining if there has been an abuse of discretion:

"The most significant guideline for the exercise of the trial judge's discretion is that a mistrial is to be declared only where it is 'manifestly necessary,' or 'under urgent circumstances,' or 'only in very extraordinary and striking circumstances,' and declaring a mistrial is not 'to be lightly undertaken.' " *Id.* at 318.

*Cornish* dealt with a mistrial declared by a trial judge who stated that she could not erase from her mind a statement made during a criminal trial that it was anticipated that a "guilty plea" was to be entered in the case. Judge Eldridge pointed out that courts have regularly permitted a retrial where the mistrial was caused by discovery of a juror's possible bias or where something has happened to render doubtful a juror's impartiality, citing a plethora of examples. The Court recognized that potential prejudice necessitating a mistrial should be weighed upon different scales depending upon who was the trier of fact:

". . . many different occurrences might lead to a concern that a juror's impartiality is impaired, but the same events might not be deemed to affect a judge's impartiality. This is because a judge's training and experience render him less susceptible to influence by improper remarks or occurrences at

> a trial. Thus, an event which would necessitate a mistrial where the trial is before a jury, might not require a mistrial in a nonjury trial." *Id.* at 322.

But where a judge is *in fact* affected by the remarks during trial and acknowledges that his objectivity is compromised, the situation is the same as when a juror's impartiality is rendered doubtful.

> "The judge, as trier of the facts in lieu of a jury, cannot properly assess the evidence if his impartiality is affected by an occurrence during the trial. In such a circumstance, there is the same 'manifest necessity' to declare a mistrial as where a juror is biased." *Id.* at 322.

The similarity in circumstances of *Cornish* and the case at bar is apparent. Both cases deal with judges sitting as triers of fact who were affected by an occurrence during trial, and who acknowledged that their objectivity was compromised by what they heard and observed.[1]

But that which was heard by the judge in *Cornish* and was " 'implanted in [her] mind' " was decisive of the very judgment she was called upon to make. Of equal importance, the prejudicial information was improperly conveyed to her and preempted her role as a fact finder when she admitted her inability to disregard it.

While the occurrence in *Cornish* was to the accused's decided detriment, the occurrence in the instant case militated to the accused's advantage. Here, that which seems to have prejudiced the judge was the conduct and demeanor of the prosecuting witnesses, the observation of which is not

---

1. Although the reason for the mistrial expressed by the District Court Judge in this case leaves something to be desired, we will accept the version suggested by the State for purposes of this case.

> "It is . . . quite possible that the trial court was effected by the fact that the witnesses apparently discussed the case among themselves even though admonished not to. This was evidenced by the fact that the trial court felt that because of its position in determining the credibility of the testimony of the witnesses, that he couldn't do it in all fairness. Thus, it would seem that there was a manifest necessity for granting the mistrial and such manifest necessity clearly appears on the record."

only proper but imperative to the fact finding process. Determining the credibility of witnesses is the primary function of a fact finder. If trial judges whose job it is to decide cases, avoid deciding them because of opinions they form of a witness' credibility, precious few cases would ever be decided.

Nor can we equate a deadlocked jury with an indecisive judge acting as the fact finder. It is somewhat difficult for a trial judge to be other than unanimous.

The credibility of the two prosecuting witnesses was crucial to the accused's case. If she could convince the fact finder that they had conspiratorially discussed their testimony in violation of the sequestration rule, flaunting the court's precise instructions to the contrary, the very foundation of the State's case would be severely damaged. If the testimony of these witnesses was not believed by the fact finder, the accused would have been exonerated.

When the mistrial was declared, however, the witnesses were freed from sanctions against conversing collaboratively and were, moreover, given ample time to do so. Their previous court experience might even incline them to that path. The accused's recourse at the second trial, of putting the violation of the sequestration rulings at the first trial before the new fact finder, does not cure the error since such evidence is diluted by time and circumstance. Guilty conduct has far more impact when the actors caught in flagrante delicto, than when it is described from memory after the fact.

The mistrial was too "lightly undertaken." *Cornish, supra.*

*Judgment reversed.*