589 A.2d 90

**Daniel Alphonzo HOWELL**

v.

**STATE of Maryland.**

**No. 659, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 2, 1991.

58

Victor A. Houlon and Richard A. Finci (Pickett, Houlon & Berman, on the brief), Hyattsville, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before MOYLAN, GARRITY and CATHELL, JJ.

CATHELL, Judge.

Daniel Alphonzo Howell was convicted, by a jury in the Circuit Court for Prince George's County, of first degree murder and using a handgun in the commission of a crime of violence. On appeal, he raises five issues for our consideration. They are:

I.  Whether the statements made by the prosecutor in closing argument unfairly prejudiced the defendant such that he was denied the right to a fair trial and such that these statements violated his right to confront witnesses against him?

II.  Whether the trial *in absentia* violated defendant's right to be present and his right to confront witnesses?

III.  Whether the evidence was not legally sufficient to sustain the defendant's convictions for first degree murder and use of a handgun in a crime of violence?

IV.  Whether the trial court erred in not allowing defense counsel to waive trial by jury?

V.  Whether the delay of sixteen months and fourteen days between the initiation of the prosecution and the start of trial was a denial of defendant's right to a speedy trial?

We shall address the issues in the order we feel most appropriate, and provide the relevant facts as we discuss them. We first address appellant's second issue:

1.

Whether the trial *in absentia* violated defendant's right to be present and his right to confront witnesses?

While it is clear that Howell was fully aware of his trial date and time, he was not present when his trial was initially called. The court was advised that he was on his way to the courthouse. At approximately 10:35 a.m., he appeared outside the courtroom door and was told to remain there. Thereafter, jurors were called for his case, and his attorney told him to take a seat in a specified location which was no more than 200 feet from the courtroom. When

counsel went to get him, he was gone. The trial court then gave Howell's trial counsel until 1:15 to ascertain Howell's whereabouts. The court reconvened at 2:00 p.m. and continued the matter until the following morning, telling the jurors to return at that time. The court made other inquiries as to Howell's whereabouts, forfeited his bond, and issued a bench warrant for his arrest.

The next morning, Howell's attorney advised the court that he was still unaware of appellant's location. The court then held a hearing on the feasibility of trying Howell *in absentia,* and the trial resumed without Howell. Howell was convicted. He appeared at his sentencing hearing and was heard on his reason for leaving on his original trial date. He referred to his fear of retribution by Jamaicans who were looking for him. He admitted that, a week after his trial, he had called his attorney and was advised to turn himself in, but declined to do so and remained at liberty until four or five months later when he was arrested on unrelated charges.

The factual situation in *Barnett v. State,* 307 Md. 194, 512 A.2d 1071 (1986), is remarkably similar to the facts of the case *sub judice.* The defendant in *Barnett* was present when the case was called for trial. He was told that jury selection would begin the next morning. He failed to appear at that time. The trial court afforded defense counsel an opportunity to investigate Barnett's absence, and the court itself made efforts to determine his whereabouts before proceeding with a trial *in absentia.*

The Court of Appeals, after discussing a Pennsylvania case that focused on an extreme situation where a fugitive might be completely unaware of his trial date, adopted a liberal posture on *in absentia* trials: "The rule taken from *LaBelle, supra, which we adopt....*" *Id.* at 210, 512 A.2d 1071 (emphasis added). Quoting from the case of *State v. LaBelle,* 18 Wash.App. 380, 397–98, 568 P.2d 808, 818 (1977), the *Barnett* Court then held:

> [W]hen a criminal defendant is present at arraignment, enters a plea, receives actual notice of the time, date and

place of the trial, deliberately absconds without a compelling reason, is represented by counsel at trial, and never offers a satisfactory explanation for his absence, a trial court may find such actions on the part of a defendant to amount to a knowing and voluntary waiver of his right to be present and may conduct the trial in his absence.

*Id.* at 208, 512 A.2d 1071 (brackets in original). In *Barnett,* the Court referred to numerous jurisdictions that had found a waiver of a defendant's right to be present where he had voluntarily absented himself from the trial before it commenced, and noted, in particular, that "The Supreme Court of Arizona has regularly affirmed convictions in cases where the defendant voluntarily failed to appear for any portion of the criminal trial." *Id.* at 209, 512 A.2d 1071 (citations omitted). Elsewhere in *Barnett,* the Court commented favorably on cases sustaining *in absentia* convictions: "It should be clear, however, that no 'talismanic properties' attach to the point at which trial begins.... Nothing in *Diaz*[1] should be interpreted as precluding a court from continuing with a trial if the defendant voluntarily waives his presence before the trial commences." *Id.* at 208, 512 A.2d 1071 (quoting *United States v. Peterson,* 524 F.2d 167, 183–84 (4th Cir.1975), *cert. denied,* 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976)) (citations omitted). The Court stated that the commencement of jury selection had nothing to do per se with the presence or absence of a valid waiver: "Barnett, by absconding on the morning of trial, had to know that he was waiving all of his rights involving his presence at that trial. That is the relevant consideration." *Id.* 307 Md. at 212, 512 A.2d 1071.

The Court then quoted favorably from *Taylor v. United States,* 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973):

It is true that a waiver is a voluntary relinquishment of a known right and, without knowledge of a right, there can be no waiver. But the right to try a defendant in absentia rests upon his waiver *of his known right to be*

---

1. *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912).

*present, not upon the (possibly unknown) court's right to try him while absent.* Here, defendant knew that he had a right to be present and has failed to show that he did not voluntarily elect to waive that right.

*Barnett,* 307 Md. at 212, 512 A.2d 1071 (emphasis in original).

We have previously set out the factual situation that resulted in Howell's being tried *in absentia.* The trial judge in the case at bar continued the trial to the following day based on his belief that Howell would contact his counsel with reasons for his absence. He also had hospitals checked to make sure that Howell's absence was not caused by illness. The trial court adequately informed the jury of the *in absentia* proceeding and gave the appropriate cautionary instructions throughout the trial.

Howell later filed a motion for new trial and testified about his absence:

[DEFENSE COUNSEL] Did you come to this courthouse in Prince George's County on that date?

A  Yes, sir.

Q  What was your reason for coming to the courthouse that day?

A  I came to court because I knew it was the day for my trial.

\*    \*    \*    \*    \*    \*

A  Not clearly, sir, but the last thing I remember you said you were going to pick the jury, and you take me around the back to sit on the bench and wait there.

He then testified as to what his wife told him about three men:

A  ... When she went around there she saw three males and one of the guys said where is the boy? If he is here yet?  ... she said she don't trust the way they look....

Q  Are you saying they followed her back to you?

A  Yeah....

Q  How many of these guys followed her back?

A  I saw two....

Q  ... What happened then?

A  ... I just left.

Q  Why?

A  I just feel scared.

Q  Scared of who?

A  Them guys.  They were Jamaicans and I was scared.  I figure they are connected to Ms. Brandford and they are from Miami.  I was really scared.  I know—I don't know them, but I know what they are capable of doing.  The reason why I left they was asking if I was there....  So I just left.

Q  What did you think they were going to do?

A  Sir, I know they would shoot me, somebody seeking revenge.  I know that for a fact.

On cross-examination, the following ensued:

Q  Did you try and contact the Court, the Judge—

A  No, ma'am.

Q  —the day of the trial, or the day after the trial was scheduled?

A  No, ma'am.  No.

Q  Did you try and contact the police to let them know that you were afraid for your life?

A  I didn't contact the police.

The court then asked several questions:

THE COURT: Did you think that your attorney might be a wee bit surprised that you weren't there for trial?

THE WITNESS: Yes, sir.

THE COURT: But you didn't call him that night?

THE WITNESS: No, sir.

THE COURT: Why not?  ...

THE WITNESS: I was like paranoid, sir.  I was paranoid.

\*       \*       \*       \*       \*       \*

THE COURT: Did you bother going to a sheriff and saying, Mr. Sheriff, those two fellows are bothering me, I am afraid of them?

THE WITNESS: No, I didn't do that, sir, because—

THE COURT: Why not?

THE WITNESS: Because they really didn't appear physically for me to do that.

\*     \*     \*     \*     \*     \*

THE WITNESS: They didn't come to no physical contact.

THE COURT: Then why were you afraid of them?

THE WITNESS: Because my wife told me that there were these guys around there asking about me....

\*     \*     \*     \*     \*     \*

THE COURT: You didn't turn yourself in, you were arrested on another charge?

THE WITNESS: Yes, sir.

THE COURT: You didn't surrender to anybody?

THE WITNESS: No, sir.

THE COURT: They arrested you?

THE WITNESS: Yes, sir.

The trial court denied the motion for new trial finding, in part:

His wife is the one that did all the hearing. He didn't hear anything. His wife should have been here to testify to that to make it carry any weight in my mind. But even if all of that is true when he leaves he doesn't even bother to call his attorney who has been representing [him] all these months and tell his attorney I'm over at whatever place, I need your advice. He doesn't do anything for I don't know how many months it was until he is picked up on another charge.

*So I simply don't believe the Defendant when he said that he left because he was afraid.* Even if I did believe it that is no good reason for his absence. There were a lot of other options that he had. I don't find that the

Defendant is in any way stupid. He is a reasonably intelligent young man.

*       *       *       *       *       *

*So the reason he walked away wasn't because he was fearful. The reason he walked away was that on seven prior court appearances the witness was not there,* he knew they were having trouble getting the witness there. *On the day of trial when the witness did show up he chooses to walk away.* That is why he walked away, the writing was on the wall, the witness was there. [Emphasis added.]

We hold that the trial judge did not abuse his discretion in conducting the trial *in absentia.* The Court of Appeals, in *Barnett,* distinguished between the holding in *LaBelle* and the holdings in Pennsylvania and New York. The *LaBelle* case granted broad powers to the Louisiana trial courts to proceed *in absentia;* the Pennsylvania and New York courts severely limited the trial court's discretion to conduct trials *in absentia.* The Court in *Barnett* unequivocally rejected the stricter rationale and clearly adopted the liberal *LaBelle* rule. *See Barnett,* 307 Md. at 208, 512 A.2d 1071.

The *Barnett* holding permits trials *in absentia* when the defendant voluntarily absents himself from trial. We hold that it is not necessary that the proceeding shall have progressed through jury selection, or even that the case has been called before the defendant absents himself, as long as he was aware of the trial date, his counsel is present, and the other provisions of the *LaBelle* rule are met. Under the *LaBelle/Barnett* holdings, a defendant who fails to appear for a known trial date may be tried *in absentia.*[2]

In the case *sub judice,* the trial judge, Judge McCullough, exhibited a complete understanding of the rule stated in *Barnett* and, in his conduct of the instant proceedings,

---

**2.**   *See also Sorrell v. State,* 315 Md. 224, 554 A.2d 352 (1989), where the Court of Appeals not only reaffirmed the *LaBelle* rule, but approved of a trial court's instruction which permitted the jury to make an inference of guilt from the absence of the defendant.

followed its suggested procedures almost to the letter. We doubt that *any* trial *in absentia* could be conducted more in accordance with *Barnett* than the trial in the case at bar. We perceive no error.

2.

Whether the statements made by the prosecutor in closing argument were improper and unlawfully prejudiced the defendant?

During the trial, the evidence indicated that a long-time acquaintance of the victim was in the victim's bedroom at the time he was shot and, in fact, had been staying in the victim's house. The witness, an individual named Carnell, did not testify. The appellant's counsel argued to the jury in closing:

> [B]ut it doesn't tell you the most important thing about a reasonable doubt, and that is where the hell does it come from. Where in this case does it come up? Where is it created? How will I know it when I see it? This is how you do it. Reasonable doubt comes from any one of the following four things. The biggest source of reasonable doubt [is] absence of evidence. . . .
>
> We have no burden of proof, no responsibility with respect to the evidence, *so if there's an absence of evidence,* that is reasonable doubt. That is attributable to the State. [Emphasis added.]

Referring to a chart, appellant's counsel then argued:

> Carnell is the little blue circle. They say that's the position of the people and that *Mike just cold-bloodedly came in and shot this man and while he was doing it my client was right there next to Carnell and did something to keep Carnell from preventing that shooting from happening.* That's basically their theory.
>
> \*    \*    \*    \*    \*    \*
>
> By the way, whoever said that my client kept Carnell at bay? Did Pat ever testify that Carnell—that my client said you stay out of this? Did Pat ever testify that my

client said anything nasty, you know, kill him, Mike, get him, Mike, I'll keep this guy out of the way?  Hey, you back up, don't get into this.  *Did you hear any testimony like that?*

\* \* \* \* \* \*

*Where is Carnell?*  Pat tells you they've been friends for 12 years.  He's been staying there for two weeks.  He's not a drifter in their lives.  He's not an acquaintance.  That's about as strong of a friend as anybody can have, let you stay in their house for two weeks, known you for 12 years.  He's there during this incident.  *Where is he?  Why didn't he come into this courtroom* and say, listen, this client of Mr. Houlon's held a weapon up to my head?  He didn't say anything to me, but he held a knife or a gun or a spoon or a banana.  He held something up to my head and it was tacitly understood if I tried to intervene in this thing, and, by the way, how do I intervene with a guy with a gun.  Consider who's going to help out this guy in the Government's version.  Under the Government's version Carnell has no weapon.  The poor dead man has no weapon.  The only one with a weapon is the shooter and maybe my client under the Government's version.  What's Carnell going to do, put his hand out and stop the bullet?  But, in any event, and getting away from that foolishness, *is Carnell in here to say*—isn't he the guy who should tell us whether he was held at bay?  *People who are held at bay are the best people to tell you they're held at bay.  I was intimidated or I was threatened because this guy held a gun or knife.  You know, he was whispered to or he said to me you make a move, you're a dead man.  Where is he?*  I don't have a burden of proof.  Am I supposed to dump him in this courtroom?  I have no burden of proof.  They have the only burden.  [Emphasis added.]

The State responded, in part:

MS. KOENIG:  May it please the Court, defense counsel, ladies and gentlemen of the jury, as defense counsel

told you, I get to address what he said.  It's called rebuttal. . . .

\*     \*     \*     \*     \*     \*

Where is Carnell?  Where is this Mr. Carnell?  How come he's not here helping poor Mrs. Brandford, his long time friend?  I'll tell you why he's not here.  It's because—

MR. HOULON: Objection, objection.

THE COURT: Sustained.  It's no evidence as to why or why he is not here.

MS. KOENIG: Then don't yourselves speculate as to why he's not here, as defense counsel asked you to.  Put yourself in his shoes.  There was an execution.  Are you going to come forward?  Are you going to place your life on that box and say that's the man who did it?

MR. HOULON: I object to that, Your Honor.

THE COURT: Objection overruled.

MS. KOENIG: He's not going to do it and he didn't do it and he will never do that. . . .

In addition to objecting at the time the remarks were made, the appellant made a motion for mistrial later in the proceeding.  He also based his Motion for New Trial, in part, on the alleged improper remarks of the prosecutor.  The trial court, in denying the motion for mistrial, stated that it did not believe the remarks, if improper, were sufficiently prejudicial so as to require a mistrial.  In a later ruling on appellant's Motion for New Trial, the trial judge opined, "I think counsel opened the door.  I think you asked for it.  She had a right to say it."  Appellant, on appeal, only challenges the trial court's denial of his motion for mistrial.  We hold that the trial court did not abuse its discretion in denying *either* of the motions.

In *Douglas v. State,* 32 Md.App. 311, 315, 360 A.2d 474 (1976), we restated the guide for determining abuse of discretion in mistrial cases, quoting *Cornish v. State,* 272 Md. 312, 322 A.2d 880 (1974): "The most significant guideline for the exercise of the trial judge's discretion is that a mistrial is to be declared only where it is 'manifestly neces-

sary,' or 'under urgent circumstances,' or 'only in very extraordinary and striking circumstances,' and declaring a mistrial is not 'to be lightly undertaken.' " *Id.* at 318, 322 A.2d 880. *See also State v. Crutchfield,* 318 Md. 200, 567 A.2d 449 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1926, 109 L.Ed.2d 289 (1990); *Jones v. State,* 310 Md. 569, 587, 530 A.2d 743 (1987); *Ezenwa v. State,* 82 Md.App. 489, 572 A.2d 1101 (1990). In *Vandegrift v. State,* 82 Md.App. 617, 573 A.2d 56, *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990), we stated:

> Maryland courts have held that, subject to the trial court's discretion, "both the State's Attorney and defense counsel are given wide latitude in the conduct of closing argument...." And, there are "no well-defined bounds beyond which the eloquence of an advocate shall not soar." ...

> Appellant further asserts that the circuit court erred in failing to take appropriate action to mitigate the effects of the State's remarks to the jury. Although Judge Rollins did not give any curative instruction to the jury in this regard, the failure to instruct the jury to disregard certain comments is not ordinarily, by itself, considered to be judicial error. And, of course, absent a clear showing of prejudice to the defendant, the trial judge's discretion in denying a mistrial will not be disturbed on appeal.

*Id.* 82 Md.App. at 636, 573 A.2d 56 (citations omitted).

Judge Chasanow recently discussed the standard of review in *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990), where it was alleged that a witness's testimony during trial and a prosecutor's remarks at a sentencing hearing each warranted the granting of a mistrial:

> "[T]he declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." This Court has recognized that granting a motion for a mistrial lies within the discretion of the trial judge. The trial judge, who hears the entire case and can weigh the danger of prejudice arising from

improper testimony, is in the best position to determine if the extraordinary remedy of a mistrial is appropriate. *Id.* at 422, 583 A.2d 218 (quoting *Jones v. State,* 310 Md. 569, 587, 530 A.2d 743 (1987), *sentence vacated and remanded,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *sentence rev'd,* 314 Md. 111, 549 A.2d 17 (1988)). The prosecutor in *Hunt,* in his rebuttal argument at the sentencing hearing, had referred to the defendant's allocution statement, by stating "it is worthless, it is trash, it is an attempt to manipulate you ..., it is insulting, it is demeaning, ... written by God knows who ..." The Court held:

A prosecutor has wide latitude in presenting a closing argument. The prosecutor is free to speak harshly and engage in "oratorical conceit or flourish and in illustrations and metaphorical allusions."

At the same time, the prosecutor's freedom to argue has some limits in order to protect the defendant's fundamental right to a fair trial. For example, the prosecutor should not make remarks calculated to inflame the jury and prejudice the defendant. But not every improper remark by a prosecutor necessarily requires a reversal.

Determining whether a prosecutor has crossed the line separating "oratorical conceit" from prosecutorial misconduct is initially within the discretion of the trial judge and should depend upon the facts of each case.....

*Id.* 321 Md. at 434–34, 583 A.2d 218 (citations omitted). *See also Ford v. State,* 73 Md.App. 391, 394, 534 A.2d 992 (1988) (the prosecutor is entitled to rebut any defense argument); *Sibiga v. State,* 65 Md.App. 69, 499 A.2d 484 (1985) (prosecutor's comparison of defendant to Al Capone was highly improper, but not so inflammatory under the circumstances as to create a real likelihood of prejudice); *Holbrook v. State,* 6 Md.App. 265, 250 A.2d 904 (1969) (prosecutor's reference to defendant's prior convictions was improper under the circumstances).

The negative evidence rule was adopted in *Eley v. State,* 288 Md. 548, 419 A.2d 384 (1980), where the defense counsel stated to the jury, "[w]e talked about all this testimony that

was in. Let's talk about the evidence that didn't exist, that didn't happen. We talk about—" *Id.* at 550, 419 A.2d 384. The trial court ruled that the defendant could not comment on the lack of fingerprint evidence. The Court of Appeals reversed, stating, in part, that the purpose of the rule forbidding comment in respect to matters not in evidence was "to prevent counsel ... from attempting to introduce ... matters which ought not be considered in ... a determination of guilt or innocence ... [and] to prevent counsel from suggesting evidence ... not presented at trial thereby providing additional grounds for finding a defendant innocent or guilty." *Id.* at 552, 419 A.2d 384. It then held that the defendant could comment on the failure of the State to produce evidence.

We had occasion to address *Eley* in a converse situation in *Henderson v. State,* 51 Md.App. 152, 441 A.2d 1114 (1982), where Chief Judge Gilbert commented: "The message sounded by *Eley* is clear: Possible relevant evidence not introduced, or its absence explained, may be used against the State." *Id.* at 153, 441 A.2d 1114. In *Henderson* the defendant was asked, over the State's objection, whether items of evidence had been obtained from the appellant when he was arrested. He responded that they had not been so obtained. The State had been previously alerted to the defendant's intention to argue negative evidence in closing argument by the defense's pretrial motion *in limine,* which requested that the State be forbidden to elicit testimony concerning the defendant's residence at a pre-release center. The State received permission from the trial judge to establish that a search of the place where the defendant was arrested was not made because it was a pre-release center, and it was improbable that a weapon would be carried into the center. We concluded:

> We think Judge Levin properly allowed the State to adduce testimony as to why the murder weapon was not located and presented at trial. Although appellant disavows any intent "to show that Detective O'Brien had not aggressively investigated the case," *Eley* would have allowed such an argument had appellant advanced it to

the jury. Even considering appellant's assurance that
there was no intention "in closing argument to say wheth-
er or not the police did anything wrong in their investiga-
tion in the matter," the inference to be drawn from
Detective O'Brien's testimony was clear.... Based on
what was then before him, and cognizant of *Eley*, he [the
trial judge] took the appropriate measure to assure that
the State was not treated unfairly.

*Id.* at 157, 441 A.2d 1114. *See also Ford*, 73 Md.App. at
396, 534 A.2d 992 ("If the State believes that the defense
will present a negative evidence argument, the prosecutor
may introduce evidence to explain why certain evidence was
not secured.") (Citation omitted.)

The appellant in the case *sub judice* asserts that the
court took no action to cure any possible prejudice, such as
informing the jury of the impropriety of the remarks. We
note that the court did announce before the jury that, "It's
[there's] no evidence as to why or why he is not here." The
prosecutor informed the jury, "Then don't you speculate as
to why he was not here." Though we agree that a direct
instruction was not given, it was pointed out to the jury
that there was no evidence of the reasons for the witness's
absence. The court, in its general instruction, also told the
jury:

Keep in mind that you are bound by my instructions as to
the law.... In other words, you will determine from the
evidence what actually happened.

The evidence in this case consists of the testimony of
the witnesses from the witness stand and the physical
evidence or exhibits admitted into evidence and any stipu-
lations made by counsel.

\* \* \* \* \* \* .

Counsel for the State and counsel for the defendants are
now going to argue the case to you. They're going to
comment on the evidence and they're going to say what
... the evidence shows. If they say anything ... about
the evidence or the facts as they see them that does not
coincide with your memory of what you heard during this

trial, you may disregard what they say and rely on your memory of what occurred.

■ Appellant also contends that, in addition to saying why the witness had not been present, the prosecution argued what his testimony would have been had he appeared, and thus appellant's right to confront the missing witness was violated. We see it differently.

We hold that the appellant's counsel completely opened the door by his extensive comments regarding Carnell's absence. In addition to asking "where is Carnell," he commented disparagingly about the possibility of Carnell's being intimidated, saying in argument, "People who are held at bay are the best people to tell you.... I was intimidated or was threatened ... he was whispered to as he said to me you make a move, you're a dead man." The clear intended inference of defense counsel's remarks was that Carnell was not intimidated and, thus, his absence was indicative that his testimony would have been adverse to the State's theory of the case. By these (and other) specific and extensive comments, based on speculation, not evidence, appellant raised the issue of Carnell's absence to such a level that the State's subsequent comments were clearly warranted to insure that it, as well as the defendant, received a fair trial.

In her opening argument, the prosecutor did not anticipate Howell's closing argument as to this issue. Nevertheless, in her final closing argument, she responded, as she was permitted to do as indicated by the authorities we have cited, not the least of which is *Henderson.* That response, considering the wealth of evidence in the case, did not unfairly prejudice the defendant.

We next discuss appellant's fourth issue.

### 3.

Whether the trial court erred in not allowing defense counsel to waive trial by jury?

■ After the appellant's disappearance and before the recommencement of the trial, appellant's counsel attempted

to waive the right to a jury trial. The judge refused to allow counsel to waive a right personal to the appellant. On this appeal, Howell argues that, because the trial court found a waiver of his right to be present at trial, he must also have waived his right to make any decision concerning trial conduct and thus had deferred those decisions to his counsel.

Maryland Rule 4–246(a) specifically states that "In the circuit court a defendant having a right to trial by jury *shall* be tried by a jury unless the right is waived pursuant to section (b)...." Section (b), in pertinent part, explicitly states: "The court may not accept the waiver until it determines, *after an examination of the defendant in open court* ... that the waiver is made knowingly and voluntarily." (Emphasis added.)

We said in *Epps v. State*, 52 Md.App. 308, 450 A.2d 913, *cert. denied*, 294 Md. 622 (1982):

A criminal defendant's right to a jury trial is as fundamental as the maxim—innocent until proven guilty. It is guaranteed by the Constitution of the United States, U.S. Const. Amend. VI, applicable to the States through the Fourteenth Amendment, and by the Maryland Declaration of Rights, Arts. 5, 21 and 24. However, this right may be waived, as when the defendant pleads guilty, *State v. Priet*, 289 Md. 267, 424 A.2d 349 (1981), or elects to be tried by a judge. Md.Rule 735 (1981 Cum.Supp.); *Rose v. State*, 177 Md. 577, 10 A.2d 617 (1940). "To satisfy constitutional due process standards, the waiver of the right to a jury trial must constitute an intentional relinquishment or abandonment of a known right or privilege." *Dortch v. State*, 290 Md. 229, 234, 428 A.2d 1220 (1981), citing *Boykin v. Alabama*, 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274] (1969).

*Id.* 52 Md.App. at 311–12, 450 A.2d 913.

The mandatory rule requires a defendant to be tried by jury unless he is *personally* examined in open court as to his desire to waive his jury trial rights. When a defendant

voluntarily absents himself from the proceedings, without having waived his right to a jury trial after examination in open court, he has not waived that right. It is a right personal to a defendant; it is not a right possessed by his counsel. The defendant only waived his right to be present at the proceeding; he did not and could not, authorize his attorney to make any further waiver of his constitutional rights.

We note that the appellant has offered no authority, other than "logic and fundamental fairness," to support his position. The State has offered no authority other than the rule and citation to cases concerned with waiver generally, such as *Treece v. State*, 313 Md. 665, 547 A.2d 1054 (1988). We see nothing illogical or unfair about the rule nor its application in this case, and thus we perceive no error or abuse of discretion in the trial court's ruling on this matter. We shall next address the sufficiency of the evidence, appellant's third issue.

### 4.

Whether the evidence was sufficient to support Howell's conviction of first degree murder and the use of a handgun in the commission of a crime of violence?

The only argument made by the appellant in support of its position on this issue is that there was insufficient corroboration of his extrajudicial statement. He contends that the only "potentially" corroborative evidence was the testimony of the victim's wife which showed that the appellant was present when the victim was shot, that he was, at that time, holding his hand near the head of a friend of the victim, and that though there was something in appellant's hand, she did not know what it was.

The victim's wife testified that she saw her husband shot. The evidence indicated that the shooter was the appellant's brother. She noticed that Howell was in the room holding a white object up to *Carnell's* head. She testified:

A   He was holding a gun.

\*     \*     \*     \*     \*     \*

Q   When you say he had a gun, who are you talking about?

A   The second person [Howell].

\*     \*     \*     \*     \*     \*

A   Not the person who shot my husband.

Q   And where did he have this gun?

A   Close up to his [Carnell's] face.

Q   Was it pointed at Carnell?

A   Yeah.

On cross-examination by the appellant's counsel, she was asked, "What was the length of time that Carnell and this other man were standing there, the man with the gun to Carnell's face?"  She answered, "I don't know how long they were standing there.  I don't remember."  There was additional evidence that the victim had been shot.  The defendant's own statements, admitted into evidence, provided, in part, that he had in fact accompanied the shooter to the scene, that they had gone to the victim's apartment to purchase drugs, that he was present during the shooting, and that he accompanied the shooter during the flight from the scene of the murder.  It is clear that any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Wilson v. State*, 319 Md. 530, 573 A.2d 831 (1990).  The defendant's statement was more than adequately and independently corroborated.  *Woods v. State*, 315 Md. 591, 556 A.2d 236 (1958).  *See also McMillian v. State*, 65 Md.App. 21, 499 A.2d 192 (1985); *Lemons v. State*, 49 Md.App. 467, 433 A.2d 1179 (1981).  Accordingly, we conclude that the evidence was sufficient to sustain appellant's conviction.  We next address the appellant's speedy trial argument.

5.

Whether the delay of 16 months and 14 days was a denial of defendant's right to a speedy trial?

■ "In all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial...." U.S. Const. amend. VI. This right is imposed by the Due Process Clause of the Fourteenth Amendment on the states. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972).

> The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*United States v. MacDonald*, 456 U.S. 1, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982).

The Supreme Court, in *Barker*, applied this right to a case involving a defendant who was not brought to trial until more than five years after his arrest. Justice Powell, writing for the Court, adopted a balancing test which took into account the conduct of both the prosecution and defense in determining the constitutional effect of a delay. *Id.* 92 S.Ct. at 2191–92. He observed:

> A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.

*Id.* at 2192 (footnote omitted). *See also United States v. Neumann,* 474 U.S. 242, 106 S.Ct. 610, 88 L.Ed.2d 587 (1986); *United States v. Loud Hawk,* 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986); *United States v. $8,850,* 461 U.S. 555, 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143 (1983); *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In *Brady v. State,* 291 Md. 261, 266, 434 A.2d 574 (1981), the Court of Appeals pointed out that

A problem peculiar to the *Barker* test is its use of the terms *presumption of prejudice* and *actual prejudice.* When there has been a lengthy pretrial delay, one of constitutional dimension, then a presumption arises that the defendant has been deprived of his right to a speedy trial; a presumption of prejudice. Once this presumption asserts itself, a balancing test must be employed which involves a weighing of four factors, one of which is actual prejudice. Actual prejudice involves a consideration of three interests the speedy trial right is meant to protect. Whatever importance it assumes in the final outcome is a function of the facts of the particular case. [Italics in original.]

## A.   Length of Delay

The sequence of events in this case is as follows:

| | |
|---|---|
| February 13, 1988 | Charged |
| March 2, 1988 | Indicted by a grand jury |
| June 17, 1988 | State requests a postponement |
| June 21, 1988 | First scheduled trial date |
| July 18, 1988 | State requests a postponement |
| July 26, 1988 | Second scheduled trial date |
| August 24–25, 1988 | Appellant requests a postponement |
| September 6, 1988 | Third scheduled trial date; appellant requests, and is granted, a postponement |

| | |
|---|---|
| September 7, 1988 | Appellant files a waiver of his rights under Maryland Rule 4–271 |
| November 23, 1988 | State requests a postponement |
| December 13, 1988 | Fourth scheduled trial date |
| February 14, 1989 | Status conference |
| March 7, 1989 | Status conference |
| March 21, 1989 | Fifth scheduled trial date |
| June 17, 1989 | Sixth scheduled trial date |
| June 27, 1989 | Trial date; appellant absents himself from the courtroom |

"The speedy trial clock starts ticking when a person is arrested or when a formal charge is filed against him." *State v. Bailey*, 319 Md. 392, 410, 572 A.2d 544, *cert. denied*, —— U.S. ——, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990); *State v. Gee*, 298 Md. 565, 471 A.2d 712 *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984). *See also MacDonald*, 102 S.Ct. at 1501; *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). When appellant was charged, he was already in jail on an unrelated matter. The delay is, therefore, calculated from the date of charging to the date of trial—in the case *sub judice*, a total of 16 months and 14 days. This delay was sufficiently protracted so as to be presumptively prejudicial. *See Epps v. State*, 276 Md. 96, 111, 345 A.2d 62 (1975) (12 months and 14 days); *Smith v. State*, 276 Md. 521, 528, 350 A.2d 628 (1976) (16 months); *Reed v. State*, 78 Md.App. 522, 554 A.2d 420 (1989) (13 months); *Carter v. State*, 77 Md. App. 462, 466, 550 A.2d 972 (1988) (7 months and 25 days); *Howard v. State*, 66 Md.App. 273, 291, 503 A.2d 739, *cert. denied*, 306 Md. 288, 508 A.2d 488 (1986) (8 months and 26 days). *See also Marks v. State*, 84 Md.App. 269, 282, 578 A.2d 828 (1990), *cert. denied*, 321 Md. 502, 583 A.2d 275 (1991). We must, therefore, apply the other *Barker* factors. *Bailey*, 319 Md. at 411, 572 A.2d 544.

### B. Reason for the Delay

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the

government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 92 S.Ct. at 2192 (footnote omitted).

The "clock" was activated on February 13, 1988. The span of time from charging to the first scheduled trial date is necessary for the orderly administration of justice, and is accorded neutral status. *Carter*, 77 Md.App. at 462, 550 A.2d 972; *Jackson v. State*, 69 Md.App. 645, 652, 519 A.2d 751 (1987); *Nocera v. State*, 36 Md.App. 317, 322–23, 374 A.2d 608, *cert. denied*, 281 Md. 744 (1977). Thus, the period from February 13, 1988, to June 21, 1988, is weighed against neither party, and as the appellant acknowledges, is excluded from our calculations.[3]

The delay from June 21 to July 26 occurred at the State's request. The prosecutor was experiencing difficulty in securing the presence of Patricia Brandford, the victim's wife, due to her emotional problems arising from the murder. The trial judge granted a continuance based on the State's representation of her illness. The appellant argues that this delay should be weighed against the State because, regardless of her medical inability to testify, no Certificate for Material Witness had been issued to compel her presence at trial.[4] We note that a reasonable delay caused by difficulty in obtaining a witness' presence is justified and will not be weighed against the State. *See Barker*, 92 S.Ct. at 2192; *Erbe v. State*, 276 Md. 541, 549, 350 A.2d 640 (1976); *Marks*, 84 Md.App. at 282, 578 A.2d 828; *Lewis v. State*, 71 Md.App. 402, 418, 526 A.2d 66 (1987); *Nocera*, 36

---

**3.** We were informed at oral argument that in Prince George's County the criminal assignment docket is controlled by the court.

**4.** *See* Md.Cts. & Jud.Proc.Code Ann. § 9–303 (1989). She had moved to Florida, and a certificate was issued on June 21, 1988.

Md.App. at 323, 374 A.2d 608. The record contains a letter from a clinical psychologist which states that "a court room ordeal will cause my client to experience a full blown psychotic break." [5] The State's failure to compel her presence was therefore excusable, and we shall consider this period of delay as neutral.

On July 14, 1988, the appellant filed a Motion to Compel Discovery concerning Mrs. Brandford's medical records. At a hearing on July 18, 1988, the State requested a continuance in order to comply with what it considered to be a valid request. The judge, noting that the trial was scheduled for July 26, stated that there was insufficient time to complete discovery, and granted a continuance over the appellant's objection. We attribute this delay to the necessity to comply with the appellant's discovery demand. We shall deem it to be neutral.[6]

The trial was then rescheduled for September 6, 1988. On August 25, 1988, the appellant filed a Motion for Continuance on the ground that new counsel had been retained, that additional time was needed to prepare, and that counsel had prior judicial commitments. The appellant argues that this delay should be counted against the State because the State would not have been ready for trial had it proceeded as planned. We disagree. The trial judge grant-

---

**5.** The victim was shot in close proximity to Mrs. Brandford while she was attempting to protect her infant.

**6.** The discovery request was filed on July 14, 1988, which our perpetual calendar indicates was a Thursday. It thus would have been received on a Friday; July 18th was the following Monday. The State therefore promptly informed the court of the difficulty. There were only six business days to obtain hospital and other medical records. We cannot say, given the usual experience, that six days are normally sufficient to subpoena and compile hospital and other medical records of a confidential nature, which ordinarily are privileged. If it had been necessary to obtain the records from a hospital or doctor, the medical professional may well have refused to provide them without a court order. A right of the parties to witness' medical or psychiatric examination or treatment, through records or otherwise, is not unlimited. *See Evans v. State,* 304 Md. 487, 508, 499 A.2d 1261 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

ed the appellant's Motion for Continuance. The next day, the appellant filed a waiver of the 180–day period specified in Maryland Rule 4–271. The trial was subsequently scheduled for December 13, 1988. We assign this delay to the appellant.

On November 23, 1988, the State requested a postponement of the trial date so that it could make arrangements to bring Mrs. Brandford involuntarily to Maryland. The continuance was granted over the appellant's objection, and trial was ultimately scheduled for March 21, 1989. We count the time from December 13, 1988, to March 21, 1989, against the State, as by that time it had had ample notice of Mrs. Brandford's reluctance to testify.[7]

The final postponement, also at the State's request, moved the trial date to June 27, 1989. Again, this was the result of problems with Mrs. Brandford's availability. As with the previous delay, the State knew of the problem and could have remedied it by March 21. It did not. Therefore, the time from March 21, 1989, to June 27, 1989, counts against it.

In sum, the 6–month plus span from February 13, 1988, to July 26, 1988, and the 42–day period from July 26, 1988, to September 6, 1988, are accorded neutral weight. The appellant's request for continuance caused the three-month and seven-day period from September 6, 1988, to December 13, 1988. This will be weighed against him. The six-month and fourteen-day delay from December 13, 1988, to June 27, 1989, is chargeable against the State due to its negligence in preparation for trial. Delays arising from prosecutorial indifference or negligence will weigh heavily against the State. *Brady,* 261 Md. at 267, 434 A.2d 574; *Jackson,* 69 Md.App. at 653, 374 A.2d 608; *Ferrell v. State,* 67 Md.App. 459, 464, 508 A.2d 490 (1986); *Lee v. State,* 61 Md.App. 169, 178–79, 485 A.2d 1014, *cert. denied,* 303 Md. 115, 492 A.2d

7. A Memorandum filed November 2, 1988, recounts her failure to appear for psychological examination on September 2–5, 1988, and for a line-up in mid-October.

616 (1985); *Powell v. State,* 56 Md.App. 351, 361, 467 A.2d 1052 (1983), *cert. denied,* 299 Md. 137, 472 A.2d 999, *reconsideration denied,* 299 Md. 656, 474 A.2d 1345 (1984). A delay due to a deliberate attempt by the State to hamper the defense will work to the State's disadvantage to a greater degree. *See, e.g., Wilson v. State,* 281 Md. 640, 654–655, 382 A.2d 1053, *cert. denied,* 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978). Thus, a 6–month and 14–day period[8] is weighed heavily against the State.

C. The Defendant's Assertion of His Right

Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.

*Barker,* 92 S.Ct. at 2192–93.

The appellant demanded a speedy trial on March 15, 1988, approximately two weeks after he was indicted, and objected to continuances on several occasions. This factor will count for him in the balancing test. *See, e.g., Bailey,* 319 Md. at 409–10, 572 A.2d 544; *Epps,* 276 Md. at 118, 345 A.2d 62; *Howard,* 66 Md.App. at 293, 503 A.2d 739.

D. Prejudice

A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration;

---

**8.** We use the calendar month, not successive 30-day periods.

(ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.

*Barker*, 92 S.Ct. at 2193 (footnote omitted).

### (i) Oppressive Pretrial Incarceration

The appellant was released on bond on November 3, 1988. The various delays during the entire period of his pretrial incarceration were either neutral or ascribed to him. The court throughout the period was reconsidering bond, and ultimately granted the same. The only delays we charged against the State occurred while appellant was free on bond. Under the facts of this case, we hold that his pretrial incarceration was not unduly oppressive.

### (ii) Anxiety and Concern

The appellant makes a bald allegation that "[t]he consequences of the arrest, accusation and impending trial caused the Defendant substantial anxiety and concern." Without more, this statement "has little significance." *Bailey*, 319 Md. at 417, 572 A.2d 544.

### (iii) Impairment of the Defense

The appellant argues that the preparation of his defense was impaired in two ways. First, he asserts that "[t]he operation of the delay, in and of itself, decreases the chances that pro-defense witnesses can be found, that the defendant can remember the incident in question sufficiently well to assist in his defense, or that exculpatory [physical] evidence [. . .] will turn up." (Quoting *Brady*, 291 Md. at 269, 434 A.2d 574.) Second, he contends that the State's inability to produce Mrs. Brandford and her records for a medical examination hampered his ability to prepare her cross-examination, as well as his overall defense.

We believe that the 6–month delay chargeable to the State did not impair the appellant's defense to a degree violative of his speedy trial right. *Carter*, 77 Md.App. at 468–70, 550 A.2d 972 (6–month trial delay attributable to

the State did not violate the right to speedy trial). *See Barker*, 92 S.Ct. at 2193–94 (minimal prejudice resulted from delay, attributable to the prosecution, of more than four years); *Jackson*, 69 Md.App. at 657, 519 A.2d 751 (14½ months weighed heavily against the State did not overcome the appellant's tactical decision to remain silent); *Howard*, 66 Md.App. at 212, 503 A.2d 739 (8 months delay, attributable to the State, of which appellant waived 2 months by failure to object, upheld); *Lewis v. State*, 71 Md.App. 402, 526 A.2d 66 (1982) (no prejudice where 7½ months out of a total of 19½ months were charged to the appellant). The case at bar is distinguishable from *Brady* due to the length of time attributable to the State. In *Brady*, 14 months were weighed against the State; here, the delay was 6 months. It is difficult to imagine how the delay would have seriously harmed the appellant's case, as he had been released on bail during most of this period and had at least equal opportunity to search for witnesses and evidence.

As to his argument that he was prejudiced by the State's inability to produce Mrs. Brandford, he is in essence complaining that he needed more time to prepare a defense. It is incongruous for the appellant to argue that his trial did not occur soon enough, yet contend that it occurred too soon for him to be able to prepare his defense. This argument has no place in a speedy trial discussion, and we shall not discuss it further. Our review of the *Barker* factors satisfies us that the appellant's speedy trial right was not violated.

Having resolved the issues raised by the appellant against him, we shall affirm.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.