RUSSELL MOORE, Plaintiff-Appellee, v. CENTREVILLE TOWNSHIP HOSPITAL, Defendant-Appellant and Third-Party Plaintiff and Separate Appellee (Albert J. Davinroy, d/b/a Davinroy Heating and Plumbing Company, Third-Party Defendant-Appellant and Separate Appellant).

Fifth District   No. 5—90—0660

Opinion filed June 25, 1993.

582

RARICK, J., dissenting.

Michael Reda, of Evans & Dixon, of Edwardsville, for appellant Albert J. Davinroy.

John E. Norton, of John E. Norton & Associates, of Belleville, and Edward J. Kionka and M. Keith Smith, both of Kionka, Smith & Associates, of Mt. Vernon, for appellee Russell Moore.

Carole M. Hummel, of Strellis, Nester, Faulbaum & Field, of Belleville, for Centreville Township Hospital.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

Defendant Centreville Township Hospital (hereinafter Hospital) appeals from a jury verdict in favor of plaintiff for injuries he received while working on a sewer repair job on the Hospital grounds. Third-party defendant Albert J. Davinroy, d/b/a Davinroy Plumbing and Heating Co. (hereinafter Davinroy), appeals from the verdict on Centreville Township Hospital's contribution action finding Davinroy 80% at fault for plaintiff's injuries. We affirm.

In June of 1983, Davinroy assigned its employee, Russell Moore, to work on a sewer repair job on the grounds of Centreville Township Hospital. The Hospital had contracted with Davinroy to repair the leaking sewer line on a time and materials basis. Davinroy employees dug a trench near where the raw sewage was leaking from the ground. This trench was approximately six to eight feet deep, 10 to 12 feet long and eight to ten feet wide. At some point during the work, it was determined that a sump hole was necessary. The sump hole was described as about three to four feet wide and about two feet deeper than the main trench. The sump pump was provided by the Hospital.

Plaintiff testified that on the day of the accident, he heard the sump pump clog up. He climbed out of the main hole to unclog it. As he squatted on the edge of the sump hole to pull the pump up, plaintiff said he felt the ground begin to give. To avoid falling into the sump hole and the sewage, plaintiff jumped across the hole. As he jumped he hit his head on the backhoe bucket. He described himself as dazed and in pain, but he continued to work that day and until the job was completed.

A few days after the accident, plaintiff went to Dr. Doy Freeland. Plaintiff complained that his head, neck, and back hurt, and he was given a neck brace. He was admitted to Memorial Hospital, and a CT scan ordered by Dr. Freeland revealed an incomplete fracture of the C-3 vertebra. Plaintiff was later referred to Dr. Joseph Hanaway and Dr. Bud Chomhirun. These doctors agreed

that, although plaintiff had some subsequent negative test results, he was seriously injured.

Count I of plaintiff's complaint alleged that the Hospital violated the Structural Work Act (Ill. Rev. Stat. 1991, ch. 48, par. 59.90 *et seq.* (now 740 ILCS 150/0.01 *et seq.* (West 1992))). Count II alleged that the Hospital was negligent in failing to provide a safe work place for plaintiff. Count III alleged that the Hospital was vicariously liable for the negligence of Davinroy. The jury found in favor of the plaintiff on each count and awarded him $340,000. On the third-party complaint, the jury found the third-party defendant, Davinroy, 80% at fault. The Hospital was found 20% at fault.

On appeal, both the Hospital and Davinroy argue (1) that the trial court erred when it admitted copies of medical reports prepared by Dr. Herbert Rosenbaum on individuals other than the plaintiff and (2) that plaintiff's counsel's inflammatory closing argument caused the jury to improperly award damages based on sympathy, passion and prejudice.

In addition, third-party defendant Davinroy argues: (1) that the amount of contribution assessed against it is contrary to the holding of *Kotecki v. Cyclops Welding Corp.* (1991), 146 Ill. 2d 155, 585 N.E.2d 1023; (2) that the trial court erred in submitting jury instructions 39 and 40 to the jury; (3) that the trial court improperly denied its motion to dismiss count III of plaintiff's amended complaint and count III of the amended third-party complaint based on vicarious liability; (4) that the verdict was against the manifest weight of the evidence; and (5) that remittitur may be proper.

Turning first to the admission of copies of examination reports prepared by Dr. Rosenbaum on individuals other than the plaintiff, the record reveals that plaintiff's exhibits 67 through 85 are medical reports prepared by Dr. Rosenbaum which contain the same negative neurological findings as Dr. Rosenbaum's medical report on plaintiff. The Hospital and Davinroy contend that there was no foundation for the admission of these records and that the prejudicial effect of these records outweighed any probative value they may have had. In addition, the Hospital argues that the admission of the records violated the physician-patient privilege and was an improper attempt to impeach Dr. Rosenbaum on collateral issues.

Both the Hospital and Davinroy contend that under Supreme Court Rule 236(b) (134 Ill. 2d R. 236(b)) these reports were not admissible without the foundation testimony of the people who made the entries in the records. In support of this argument, the Hospital cites *Smith v. Victory Memorial Hospital* (1988), 167 Ill. App. 3d

618, 521 N.E.2d 210, which holds that hospital records are excluded from Rule 236 and may be admitted under this business records exception to the hearsay rule only if the proponent calls as a witness every person who made entries on those records. *Smith v. Victory Memorial Hospital* (1988), 167 Ill. App. 3d at 621, 521 N.E.2d at 211, citing *Mayer v. Baisier* (1986), 147 Ill. App. 3d 150, 497 N.E.2d 827.

. ■ Supreme Court Rule 236 is the business records exception to the hearsay rule. And, as the defendants correctly point out, hospital records were excluded from this exception at the time of this trial. (Official Reports Advance Sheet No. 8 (April 15, 1992), R. 236, eff. August 1, 1992 (amended April 1, 1992, to include medical records in the business records exception).) However, the business records exception to the hearsay rule is inapplicable to the facts of this case because plaintiff's exhibits are not hearsay. That is, these records were not offered to prove the truth of their contents, but to demonstrate Dr. Rosenbaum's alleged bias in favor of defendants.

On the separate evidentiary issue of authentication, plaintiff's witness, Mary Shulte, R.N., testified that she was familiar with and recognized the reports and the signatures on the reports as those of Dr. Rosenbaum. This was sufficient to authenticate these reports, particularly since neither defendant objected to Shulte's identification of the reports and the signatures as those of Dr. Rosenbaum, although the Hospital did object to a comparison of the language in the reports to the language in Russell Moore's report.

Ultimately, these reports were also used to corroborate Janet Ottinger's testimony. Ottinger, a former Rosenbaum employee, testified that Dr. Rosenbaum's negative neurological examination results were programmed into the office typewriter and were entered on patient examination reports at the touch of a single key. Plaintiff's use of the fact that Dr. Rosenbaum programmed a negative neurological examination into his office equipment, as illustrated by the challenged reports, coupled with the fact that Dr. Rosenbaum testified that 90% of his medical-legal opinions were rendered on behalf of the defense, was not an impermissible demonstration of bias. The identical negative neurological findings in the reports issued by Dr. Rosenbaum were relevant for this purpose.

The Hospital also argues that use of these reports to impeach Dr. Rosenbaum violates the physician-patient privilege. (Ill. Rev. Stat. 1991, ch. 110, par. 8—802 (now 735 ILCS 5/8—802 (West 1992)).) This section states, in relevant part:

"No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve such patient ***." Ill. Rev. Stat. 1991, ch. 110, par. 8—802 (now 735 ILCS 5/8—802 (West 1992)).

The narrow question presented in this case is whether Rule 215(a) (134 Ill. 2d R. 215(a)) examination reports prepared by a testifying expert witness-physician on litigants other than the current plaintiff are protected by the physician-patient privilege.

The Hospital argues that Dr. Rosenbaum's reports are privileged and should not have been admitted at plaintiff's trial. The Hospital bases this argument on *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210, which held without comment that the trial court properly denied the defendant's subpoena of plaintiff's doctor's patient records because it would have violated the doctor-patient privilege. The Hospital also relies on *Trower v. Jones* (1988), 121 Ill. 2d 211, 520 N.E.2d 297 (inquiries may be made into annual income derived from expert testimony and the frequency of testimony for defendants and plaintiffs), and *Davis v. Hinde* (1986), 141 Ill. App. 3d 664, 490 N.E.2d 1049 (a list of every one of plaintiff's attorney's clients who were treated by plaintiff's treating doctors was impermissible). We note that *Sears* and *Davis* involve attempts to obtain records of patients who were being *treated* by the doctors involved.

The plaintiff argues that because each of these reports was created by Dr. Rosenbaum solely for the purpose of rendering a medical-legal opinion, they were not protected by the physician-patient privilege. In support of his argument, plaintiff cites *Geisberger v. Willuhn* (1979), 72 Ill. App. 3d 435, 390 N.E.2d 945, which holds that in order for a communication to be privileged, it must have been necessary for the performance of a professional duty on the part of the physician: a duty to treat, prescribe or act for the patient. *Geisberger*, 72 Ill. App. 3d at 437, 390 N.E.2d at 947.

*Geisberger's* interpretation of the scope of the physician-patient privilege is consistent with the original purposes of the privilege. The privilege, which did not exist at common law, was created to encourage full disclosure of all medical facts by the patient in order to ensure the best diagnosis and treatment for the patient. *Parkson v. Central Du Page Hospital* (1982), 105 Ill. App. 3d 850, 435 N.E.2d 140; see also Feldman, *Between Priest and Penitent, Doctor*

*and Patient, Lawyer and Client ... Which Confidences Are Protected?*, 14 Fam. Advoc. 20 (Fall 1991).

In this case, as the retained medical expert for the defendant, the relationship between Dr. Rosenbaum and each of the plaintiff-"patients" listed in the reports was adversarial. These individuals had no reason to fully disclose all medical facts to Dr. Rosenbaum because he owed them no duty to treat, prescribe or act on their behalf or for their benefit. Consequently, the physician-patient privilege is not implicated.

In a related situation, courts have determined that no physician-patient privilege is created when a criminal defendant undergoes a court-ordered examination in anticipation of his possible insanity defense. (*People v. Primmer* (1983), 111 Ill. App. 3d 1046, 444 N.E.2d 829.)

> "[T]he privilege created by this statute is not applicable where the examination is by a court appointed physician because such examination does not constitute consultation with the physician in his professional character. [Citation.] [The physician-patient privilege,] with certain exceptions, provides specifically that that communication relating to diagnosis or treatment of the patient's mental condition between patient and psychiatrist is privileged from disclosure in civil and criminal cases and in proceedings preliminary thereto. Since the section goes on to define 'patient' as 'a person who for the purpose of securing diagnosis or treatment of his mental condition consults a psychiatrist,' the privilege granted by the section would not apply where the court orders the psychiatric examination." *People v. English* (1964), 31 Ill. 2d 301, 306-07, 201 N.E.2d 455, 459.

■ We hold that no physician-patient privilege is created as a result of an examination by a physician, employed by an opponent, solely for the purpose of rendering a medical-legal opinion. A plaintiff's statements which are obtained during such an examination will clearly be disclosed to the opponent in the litigation. While physician-examiners should not blithely disclose information gathered under a court-ordered examination to those not involved in the litigation, information disclosed in such an examination is not privileged because neither confidentiality nor treatment is contemplated by the plaintiff-examinee.

Therefore, because no physician-patient privilege was created when Dr. Rosenbaum examined the individuals named in plaintiff's reports, plaintiff was not barred by the physician-patient privilege

from using the reports even though the subjects of the examination were not parties to this litigation.

We agree with the defendant's assertions that by allowing attorneys to use records such as these to impeach medical experts, the door could be opened for subtrials on issues remote from the subject of the lawsuit. However, limitation of cross-examination of a medical expert rests within the sound discretion of the trial judge. (*Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210.) The trial judge in this case did not abuse his discretion when he allowed plaintiff to impeach Dr. Rosenbaum with his own reports containing virtually identical negative neurological findings for several other litigants.

The Hospital and Davinroy next argue that the trial court erred when it denied their motions for mistrial based on plaintiff's counsel's improper and prejudicial conduct during closing argument. Plaintiff's counsel's inflammatory remarks, they contend, caused the jury to award damages in favor of plaintiff based on sympathy and passion. In support of this argument, defendants point out that during plaintiff's rebuttal, defendants' counsel objected 25 times, and 16 of their objections were sustained.

Plaintiff contends that most of counsel's closing argument was proper because almost all the objectionable comments were made in response to defendants' attacks upon the plaintiff, plaintiff's counsel, and plaintiff's case. Plaintiff argues additionally that any improper comments were cured when the trial court sustained objections to them or that they were so innocuous that they did not deprive the defendants of a fair trial.

The Hospital's arguments attack plaintiff's counsel's closing argument for four basic reasons, each of which, it contends, was prejudicial and deprived it of a fair trial. The Hospital cites the following arguments:

(1) Plaintiff's counsel impugned the integrity of defendant's expert, Dr. Rosenbaum, by referring to him as "an advocate," "sneaky," a "hired gun," and a "high-priced expert" and pleaded with the jury to "stop what's happening in this courtroom with a doctor such as Dr. Rosenbaum."

(2) Plaintiff's counsel improperly implied that defense counsel was deceiving the jury by accusing the defendants of playing a defense game and by telling the jury that "they fiddle with you. They fiddle with you by making these attacks," by telling the jury that "if you haven't got anything you shout and shout and shout, attack, attack, attack. And that's exactly what you're seeing here," and by

implying that defense counsel put a lying witness on the stand when it called Dale Kress.

(3) Plaintiff's counsel improperly related his personal experiences and feelings to the jury by exclaiming that he was incensed with this, that he was "sick and tired of hearing about this sump pump," that he was "quite an outdoorsman" and had been "up elk hunting," and that he "came from the farm."

(4) Plaintiff's counsel improperly asked the jury to set the conscience of the community and asked the jury to put itself in plaintiff's place when he said, "It's—it's how you feel when your sister comes in and does work for you ***."

Third-party defendant Davinroy cites many of the same errors and argues in addition:

(1) Plaintiff's counsel made improper remarks impugning counsel for Davinroy when he argued that "Mike Reda, is a—the defense lawyer here is a young man, but he is very experienced. He's from one of the biggest defense firms in the area ***" and when he said, "Mike Reda is up here with tongue in cheek, says we got a weak case."

(2) Plaintiff's counsel's argument "you're going to see some reports back there, too. And I want you to look at them and see what kind of man we're dealing with," in reference to Dr. Rosenbaum, was improper.

(3) It was improper for plaintiff's counsel to argue, "I get incensed with this and maybe you will, too, if you're the kind of people I think you were when I picked you," or to challenge the jury to be cross-examined by himself or any of the attorneys and to be able to, after seven years, "put every dot on every single 'I' and cross every single 'T' " or to ask the jury, "I don't know where you come from but where I come from, *** people don't run to the doctor every minute."

(4) Plaintiff's counsel improperly argued that the plaintiff was afraid for his children and that somebody with an education could do their job in a wheelchair "but not a boy who's eleventh grade."

Although the majority of the aforementioned arguments were objected to and the objections were sustained, the Hospital argues that the prejudicial effect of these types of arguments is not always erased from the minds of the jurors by objections that are sustained and that the cumulative effect of the argument denied it a fair trial. Both the Hospital and Davinroy request a new trial. Davinroy also requests that this court reverse the judgment against it and enter a judgment in its favor on the third-party complaint.

An attorney is permitted wide latitude in closing argument (*Guzeldere v. Wallin* (1992), 229 Ill. App. 3d 1, 593 N.E.2d 629), and a judgment will not be reversed unless the challenged remarks were of such a character that they prevented the defendant from receiving a fair trial (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 576 N.E.2d 918). In determining whether a party has been denied a fair trial, due to an improper closing argument, a reviewing court gives considerable deference to the trial court because it is in a superior position to assess the accuracy and effect of counsel's statements. (*Guzeldere v. Wallin*, 229 Ill. App. 3d at 15, 593 N.E.2d at 638.) In addition, even where a party has preserved the issue, counsel's improper arguments will not warrant reversal absent a showing of substantial prejudice. *Ryan v. Katz* (1992), 234 Ill. App. 3d 536, 542-43, 600 N.E.2d 1206, 1211.

■ A few of the arguments challenged on appeal were not objected to at trial. These comments include plaintiff's counsel's remarks that "the defense game goes on," that the jury was being "fiddled with," and that the plaintiff was afraid for his children. Generally, failure to object to comments made during closing argument is considered a waiver of the objection. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d at 119, 576 N.E.2d at 937.) Therefore, any objection to these comments is waived.

Additionally, plaintiff contends that many of the comments objected to by the Hospital and Davinroy were invited by their attorneys' closing arguments. We agree. Although two improper arguments do not make a right result (*Chuhak v. Chicago Transit Authority* (1987), 152 Ill. App. 3d 480, 492, 504 N.E.2d 875, 883, quoting *United States v. Young* (1985), 470 U.S. 1, 11, 84 L. Ed. 2d 1, 9, 105 S. Ct. 1038, 1044), a party may not claim error based on invited remarks (*In re Salmonella Litigation* (1990), 198 Ill. App. 3d 809, 556 N.E.2d 593; *Wilson v. Colston* (1983), 120 Ill. App. 3d 150, 457 N.E.2d 1042).

Some of the the comments which were invited included plaintiff's counsel's statements that third-party defendant's counsel Mike Reda "says we've got a weak case." In fact, Mr. Reda did argue that "if you look at the amount of exhibits and the explanation of preponderance,—I think they've got a weak case." Mr. Reda further commented that "we're falling and tripping over a lot of these exhibits—a lot of that suggests to me he's got a weak case—exhibits attempt to overwhelm you with a weak case." Another invited

statement is plaintiff's counsel's statement in reference to Dale Kress, an occurrence witness who was interviewed by the plaintiff, but ultimately called by the defendant. In reference to Kress, plaintiff's counsel argued, "Do you want me to put on the witness stand a person that I think is not telling the truth?" The Hospital's attorney, A.J. Nester, invited this response when he argued, "Now if I were Mr. Norton, I wouldn't want Mr. Kress into this courtroom at all either." The argument was also invited by Mr. Reda's argument to the jury that plaintiff's attorney and investigator had almost browbeaten Kress into changing his story and his insinuation that, when Kress would not change his story, plaintiff's investigator was called as a witness in his place.

Plaintiff's counsel's challenge to the jury to be cross-examined and his argument that the plaintiff was not a crybaby were also fair responses to defendants' counsels' arguments. In all, the tenor of the entire closing argument was such that plaintiff's counsel's remarks, including those that the defense "didn't have anything," that he was "incensed," and that he was "sick and tired," did not combine to deprive the defendants of a fair trial.

Next, the Hospital argues that it was error for plaintiff's counsel to suggest that the jury place itself in the shoes of the defendant. (*Offutt v. Pennoyer Merchants Transfer Co.* (1976), 36 Ill. App. 3d 194, 343 N.E.2d 665.) The objection to this line of argument was sustained, however, and plaintiff's counsel's subsequent argument asked the jury to consider how the plaintiff feels. Defendants were not denied a fair trial by these comments.

Similarly, plaintiff's counsel's remarks about his personal experiences on the farm and elk hunting were not error. Although plaintiff's counsel did refer to himself in these illustrations, when viewed in context, these stories were more in the nature of down-to-earth explanations of the legal processes than attempts to inflame or prejudice the jury against the defendants. For example, with reference to elk hunting, plaintiff's counsel stated that "if you go somewhere like that, you need a guide *** maybe I can try to be a guide for you a little bit during this case."

Defendants also object to plaintiff's counsel's comments about Dr. Rosenbaum. Plaintiff's counsel referred to Dr. Rosenbaum as "an advocate" and "a little sneaky." In addition, he asked the jury to "stop what's happening in this courtroom with a doctor such as Dr. Rosenbaum" and admonished it to "see what kind of man we're dealing with."

These arguments were certainly zealous, but in the context of the evidence adduced at trial and the closing arguments of defense counsel, we conclude that these comments were not improper. This is especially true in light of testimony by plaintiff's witness, Mary Shulte, R.N. Shulte accompanied plaintiff to his examination with Dr. Rosenbaum. She was present throughout the entire examination and testified that Dr. Rosenbaum neither took note of all the plaintiff's complaints nor did he actually perform some of the neurological tests he testified that he performed. If the jury accepted Shulte's testimony, it could conclude that Dr. Rosenbaum was an advocate.

Plaintiff's counsel's designation of defense doctors Hoag and Rosenbaum as "high-priced" experts and his subsequent reference to "these hired-gun doctors" have traditionally had more serious implications. Courts have held that these types of comments during argument are improper. See *Principato v. Rudd* (1981), 102 Ill. App. 3d 362, 430 N.E.2d 63; *Regan v. Vizza* (1978), 65 Ill. App. 3d 50, 382 N.E.2d 409; *Cecil v. Gibson* (1976), 37 Ill. App. 3d 710, 346 N.E.2d 448; Hegarty, *Charting the Boundaries of the Closing Argument*, 5 Ill. Trial L.J. 21 (1983).

We disagree. Courts and commentators alike have expressed their concern with the reliability of expert testimony.

> "The handling of expert witnesses and their cross-examination may be summed up in the old adage, 'Whose bread I eat, his song I sing.' One need only scan the professional journals to observe that experts are for hire in the market place on an almost illimitable number of 'specialities.' In this era of complex technology and with a litigation explosion of geometric proportions, especially in the fields of products liability and malpractice, these persons are essential for the jury's understanding of the subject matter of lawsuits. However, the corollary to this proposition is that they are hired partisans and in judging their testimony the jury is entitled to know whence they came. This is especially true when, as in the instant case, the duel of the experts is one-on-one. It would be a rare case today when the expert witness is the saintly country doctor or the kindly county surveyor, known to the whole community including the jury." (*Sears v. Rutishauser* (1983), 117 Ill. App. 3d 61, 68, 453 N.E.2d 1, 5-6 (Webber, P.J., concurring in part, dissenting in part), *rev'd* (1984), 102 Ill. 2d 402, 466 N.E.2d 210.)

"It is often surprising to see with what facility and to what an extent [expert's] views can be made to correspond with the wishes or interests of the parties who call them ... [t]heir judgment becomes so warped by regarding the subject in one point of view that even when conscientiously disposed, they are incapable of expressing a candid opinion ... They are selected on account of their ability to express a favorable opinion, which, there is great reason to believe is in many instances the result alone of employment and the bias growing out of it." (Graham, *Impeaching the Professional Expert Witness by a Showing of Financial Interest*, 53 Ind. L.J. 35, 37 (1977) (statement by Prof. Hines at 135 J. Franklin Inst. 309).)

In the advisory committee notes to Federal Rule 706, which provides for court-appointed experts, the committee recognizes that the practice of shopping for experts, the venality of some experts, and the reluctance of many reputable experts to become involved in litigation are matters of deep concern. Fed. R. Evid. 706, Advisory Committee's Note. See also *Trower v. Jones* (1988), 121 Ill. 2d 211, 520 N.E.2d 297; *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210; Graham, *Impeaching the Professional Expert Witness by a Showing of Financial Interest*, 53 Ind. L.J. 35 (1977); Bernstein, *Out of the Frying Pan and Into the Fire: The Expert Witness Problem in Toxic Tort Litigation*, 10 Rev. Litig. 117 (1990) (author's general concerns are equally applicable to all expert witnesses).

In an effort to address these concerns, the permissible bounds of cross-examination have been increasingly expanded. For example, in *Sears*, the supreme court recognized it was possible that plaintiff's expert "contoured his testimony to assure a steady stream of lucrative referrals in the future," and reversed the case to allow defense counsel to inquire into the number and frequency of the expert's referrals from plaintiff's counsel and the financial benefits derived therefrom. (*Sears v. Rutishauser*, 102 Ill. 2d at 410-11, 466 N.E.2d at 214.) The supreme court reiterated the importance of allowing effective cross-examination in *Trower*. Cross-examination has become increasingly important, the supreme court observed, because "many experts today spend so much of their time testifying throughout the country that they might be deemed not only experts in their field, but also experts in the art of being a persuasive witness and in the art of handling cross-examination." *Trower v. Jones*, 121 Ill. 2d at 216, 520 N.E.2d at 299.

However, notwithstanding the recognition that favorable expert opinions are often for sale, and the expansion of permissible cross-examination, experts continue to be protected during closing argument. (See *Green v. Cook County Hospital* (1987), 156 Ill. App. 3d 826, 510 N.E.2d 3; *Principato v. Rudd* (1981), 102 Ill. App. 3d 362, 430 N.E.2d 63; *Regan v. Vizza* (1978), 65 Ill. App. 3d 50, 382 N.E.2d 409.) As it stands, opposing counsel is allowed to show that the expert developed the opinion he or she testified to for significant compensation. Opposing counsel can also show that an expert testifies primarily for plaintiffs or for defendants and that the expert regularly receives referrals from an attorney or a party involved in the case. It is improper, however, for opposing counsel to argue that an expert is an advocate, or a hired gun, or a professional witness. It is improper even though opposing counsel's evidence proves that these characterizations are true.

We believe it is time to accord the same level of deference to expert witnesses as is granted to any other witness. Opposing counsel can argue to the jury that any other witness is lying if evidence supports this proposition. See *People v. Carter* (1979), 73 Ill. App. 3d 406, 392 N.E.2d 188 (the evidence supported an inference that the witness lied and the prosecutor could say so); and *People v. Driver* (1978), 62 Ill. App. 3d 847, 379 N.E.2d 840 (statements that testimony is false are allowed if supported by the evidence and inferences from it).

■ We hold that opposing counsel may argue to the jury that an expert witness is distorting the truth for financial gain or is a professional witness, if evidence supports the argument. We see no reason to limit opposing counsel to the bland, rather benign and perhaps meaningless comment that an expert is biased because he or she was paid to testify. Lawyers use words to persuade: advocate, hired gun, prostitute, professional witness; each of these terms conveys this proposition in a colorful manner. Cooks use the words "cream" and "coddle" to describe techniques in their field.[1] Each word, however, has a secondary meaning, which leads us to our culinary conclusion; we decline to follow a rule of law that approves of creaming an expert on cross-examination, but which requires coddling him during closing.

---

[1]Cream: to mix a softened ingredient, like butter, alone or with other ingredients, such as sugar, until well blended and completely soft. Coddle: to poach in a slowly simmering water, as a coddled egg. Julee Rosso & Sheila Lukins, *The New Basics Cookbook* (1989).

Evidence adduced at trial showed that both Dr. Hoag and Dr. Rosenbaum were paid for their opinions. Dr. Hoag testified that about 10% of his practice is in medical-legal issues and that 75% of the time he works for the defense. Dr. Hoag charges $600 for a 1½- to 2-hour deposition.

Dr. Rosenbaum testified that 90% of his medical-legal practice is defense oriented. He testified that he performed up to three medical-legal examinations each week and charged $150 per hour for these examinations and $200 per hour to review medical records in the case. He charges $400 for the first hour of a deposition and $350 for each subsequent hour. In addition, plaintiff presented evidence that Dr. Rosenbaum's reports for several medical-legal opinions, for which he was paid, were virtually identical and all negative. Thus, there was evidence to support plaintiff's counsel's comments that defense doctors Hoag and Rosenbaum were "high-priced" experts and "hired-gun doctors." For this reason, the trial court did not err when it denied the Hospital and Davinroy's motions for mistrial.

■ Finally, plaintiff's counsel's plea for the jury to act as the conscience of the community was improper, and although objection to it was sustained, error is not removed if it reasonably appears that this argument influenced the verdict. (*Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 576 N.E.2d 918.) However, the verdict, in light of the damages requested, leads to the conclusion that this award was not a result of prejudice. Plaintiff's expert suggested three possible damage figures for lost income: $1,002,385 if plaintiff is unable to work; $901,483 if he works in a minimum-wage job; and $418,085 if he continues to work but employs a helper. The verdict of $340,000 is below even the lowest suggested figure for lost income only. Therefore, we conclude that this award is not the result of passion or prejudice.

Third-party defendant Davinroy also argues that the verdict is against the manifest weight of the evidence. Davinroy attacks both the damage award and the distribution of liability. It suggests remittitur may be proper. Broken down into its component parts, the total damage award is: disability as a result of the injury, $30,000; past and future pain and suffering, $50,000; past and future medical care, $80,000; and past and future lost earnings, $180,000. Davinroy contends that the verdict bears no reasonable relation to the loss suffered by plaintiff. Davinroy further argues that figures used by plaintiff's witness Dr. Leroy Grossman to cal-

culate lost wages were based on faulty assumptions and that the verdict was excessive in light of the conflicting medical evidence regarding plaintiff's injuries.

An award of damages is excessive if the amount falls outside the necessarily flexible limits of fair and reasonable compensation or if it is so large that it shocks the judicial conscience. (*Simmons v. Union Electric Co.* (1984), 121 Ill. App. 3d 743, 757, 460 N.E.2d 28, 38, *aff'd* (1984), 104 Ill. 2d 444, 473 N.E.2d 946.) The amount of damages to be awarded is generally left to the discretion of the jury. However, that discretion is not unlimited, and it is the court's duty to reverse if the damage award is clearly against the manifest weight of the evidence or bears no reasonable relationship to plaintiff's loss. (*Burnham v. Lewis* (1991), 217 Ill. App. 3d 752, 756, 577 N.E.2d 922, 924.) Factors to consider when evaluating a damage award include the extent and permanency of the injuries, the possibility of further deterioration, the plaintiff's age, medical expenses, past and future wages lost and any restrictions the injury may have placed upon the plaintiff. *Simmons v. Union Electric Co.*, 121 Ill. App. 3d at 758, 460 N.E.2d at 38.

■ Plaintiff offered evidence that he had medical expenses in excess of $30,000; that he continues to suffer from pain in his neck, back and legs as a result of the accident; that his pain will get progressively worse; that he is working but only with the aid of a helper; that the helper will continue to be required if he is to remain employed; and that the injury will limit his ability to perform certain jobs and to enjoy activities such as hunting, which he had enjoyed prior to the accident. This is sufficient evidence upon which the jury could have based its verdict. Davinroy's counsel vigorously cross-examined plaintiff's witness, Dr. Grossman, on the accuracy of the figures he used to calculate plaintiff's losses. Consequently, the jury also considered the bases for his calculations in arriving at its verdict. That verdict is not against the manifest weight of the evidence. Therefore, neither reversal nor remittitur is required.

Third-party defendant Davinroy also attacks the verdict finding it 80% liable as excessive and against the manifest weight of the evidence. It argues that the totality of the circumstances clearly shows that the Hospital was primarily in charge of the sewer project. The circumstances Davinroy cites in support of its argument include the fact that Hospital maintenance employees were on the jobsite and could have stopped the sewer repair work; that the Hospital provided some of the tools for the repair project; and that the

Hospital retained financial control of the project because it was a time and material job.

A jury verdict is against the manifest weight of the evidence only if, after viewing the evidence in the light most favorable to the prevailing party, the opposite conclusion is clearly apparent or the jury's finding is palpably erroneous. *Reid v. Sledge* (1992), 224 Ill. App. 3d 817, 820, 587 N.E.2d 1156, 1159.

■ Evidence was also presented, however, that Mr. Davinroy regularly visited the jobsite; that Davinroy employees did not have free access to Hospital equipment; and that no one from the Hospital directed the methods or the manner in which the job was performed. And, although Davinroy's job foreman testified that he would have stopped working at the Hospital's request, he said he also would have immediately contacted Davinroy for further instructions. In addition, the Hospital's director of maintenance testified that only Davinroy employees worked on the job and that the backhoe belonged to Davinroy. Conflicting testimony was offered on the Hospital's input and influence with regard to which of Davinroy's employees could work on Hospital projects.

After viewing this evidence in a light most favorable to the Hospital, it is apparent that the jury could have believed that while both the Hospital and Davinroy were supervising this project, Davinroy had greater responsibility for the ultimate safety of its employees. The jury verdict apportioning 80% liability to Davinroy and 20% liability to the Hospital is not against the manifest weight of the evidence.

Davinroy next contends that the trial court erred by submitting plaintiff's instructions 39 and 40 to the jury. These instructions were non-Illinois pattern instructions. Davinroy argues that they improperly isolated and emphasized one portion of the evidence thereby allowing the jury to more easily find liability against the defendants. Davinroy contends that instruction 33-A covered the same subjects.

Instructions 39 and 40 stated:

"Under Count Two, one of the questions for you to determine is whether Centreville Township Hospital had a sufficient relationship to the work to be responsible for the plaintiff's injuries.

Under that count, the Hospital may be held liable to the plaintiff if one or more of the following conditions were met, and the Hospital's failure to act was a proximate cause of the plaintiff's injury:

a. The Hospital knew or should have known that the work was likely to create, during its progress, an unreasonable risk of physical harm to others unless special precautions were taken, but failed to require Davinroy to take those precautions or failed to exercise reasonable care to provide in some other manner for the taking of such precautions.

b. The Hospital retained control of any part of the work and failed to exercise that control with reasonable care.

Under Count Three, one of the questions for you to determine is whether Centreville Township Hospital is responsible for the negligence of Davinroy.

Under that count, the Hospital may be held liable to the plaintiff for the negligence of Davinroy if one or more of the following conditions were met:

a. The Hospital should have realized that the contracted work was likely to create a special risk of physical harm to Davinroy's employees unless special precautions were taken.

b. The Hospital retained possession of the premises where the construction was being done during the progress of the work.

c. The Hospital was under a duty, by reason of administrative regulations, to provide specified safeguards or precautions for the safety of Davinroy's employees, and Davinroy failed to provide such safeguards or precautions.

d. The Hospital knew or had reason to know that the work Davinroy was employed to do inherently or normally involved a special danger to Davinroy's employees, and Davinroy failed to take reasonable precautions against such danger."

██ Plaintiff argues that Davinroy failed to properly preserve its objections to instructions 39 and 40 and, alternatively, that the instructions were proper. To preserve an objection to an instruction, the objection must be set forth with specificity so that the trial court can adequately be advised of the specific nature of the objection before it rules. (Supreme Court Rule 239(b) (134 Ill. 2d R. 239(b)); *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 501 N.E.2d 830.) Davinroy objected that these instructions improperly isolated one portion of the case and one portion of the evidence. Instructions 39 and 40 themselves identified the part of the case Davinroy objected to highlighting. Subsequent argument

made it clear that the objection was concerned with the possibility that these instructions made it easier to find the Hospital and Davinroy liable. Davinroy's objection adequately preserved the issue for review.

However, instructions 39 and 40 were not given in error. Every litigant has a right to have the jury instructed on his theory of the case. In order to justify the instruction, some evidence in the record must support the theory. (*Hopkinson v. Chicago Transit Authority* (1991), 211 Ill. App. 3d 825, 837, 570 N.E.2d 716, 724.) The test in determining the propriety of submitted jury instructions is whether, taken as a whole, they are sufficiently clear so as to not mislead the jury and whether they fairly and accurately state the law. *Harnischfeger Corp. v. Gleason Crane Rentals, Inc.* (1991), 223 Ill. App. 3d 444, 585 N.E.2d 166.

Plaintiff's instructions 39 and 40 supplemented instruction 38A, which was patterned after Illinois Pattern Jury Instructions, Civil, No. 180.07 (3d ed. 1992) and paralleled plaintiff's complaint. Instructions 39 and 40 identified the specific conditions required before the Hospital could be liable under counts II and III. They were supported by plaintiff's evidence that the Hospital was in charge of the sewer project. That evidence included the fact that a Hospital employee directed part of the work and had the power not only to stop the job, but to request certain employees; that a Hospital employee approved all expenditures; and that some tools, including the sump pump, came from the Hospital. Taken as a whole, the instructions fairly and accurately state the law applicable in this case.

Davinroy also contends it was error for the trial court to deny its motion to dismiss count III of plaintiff's amended complaint and count III of the amended third-party complaint. Count III of plaintiff's amended complaint is a claim for vicarious liability against the Hospital based upon the acts of third-party defendant Davinroy. Count III of the amended third-party complaint is a claim for contribution against Davinroy based upon the allegations in plaintiff's complaint. Davinroy argues that these claims are barred by the exclusive remedy provisions of the Illinois Workers' Compensation Act because they are in reality direct actions against the third-party defendant. (Ill. Rev. Stat. 1991, ch. 48, par. 138.11.) Count III is a direct action, Davinroy argues, because it places the actions of Davinroy, as plaintiff's employer, directly in issue in the case. We disagree.

Count III is permissible because it is an action against the Hospital based on the acts of its independent contractor. In count

III, plaintiff alleges that the Hospital is liable for the negligent acts of Davinroy because: (1) the Hospital did or should have recognize(d) that the trench would be likely to create a peculiar risk of physical harm unless special precautions were taken; (2) the Hospital did or should have know(n) that inherent to or normal to the work was a special danger to others and that special precautions were needed; (3) the Hospital retained possession of the land during the progress of the work; and (4) the Hospital was under a duty by statute and by administrative regulation to provide specified safeguards or precautions for the safety of others. These allegations are based upon Restatement (Second) sections 415, 427, 422, and 424, respectively, of the Restatement (Second) of Torts. (Restatement (Second) of Torts §§415, 427, 422, 424 (1965).) The sections are exceptions to the general rule that the employer of an independent contractor is not liable for the acts or omissions of the independent contractor. (See generally, *Benesh v. New Era, Inc.* (1991), 207 Ill. App. 3d 1049, 566 N.E.2d 779; *Claudy v. City of Sycamore* (1988), 170 Ill. App. 3d 990, 524 N.E.2d 994.) As such, the allegations in count III stated a valid cause of action against the Hospital. The Hospital was, therefore, entitled to seek contribution from Davinroy.

Finally, Davinroy argues that the trial court erred when it denied Davinroy's post-trial motion because the amount of contribution assessed against it was contrary to law. Davinroy points out that under the Illinois Contribution Among Joint Tortfeasors Act, no party is liable to contribute beyond his *pro rata* share of the common liability. (Ill. Rev. Stat. 1991, ch. 70, par. 303.) Under *Kotecki v. Cyclops Welding Corp.* (1991), 146 Ill. 2d 155, 585 N.E.2d 1023, Davinroy argues its *pro rata* share of liability may not exceed the worker's compensation benefits paid to the plaintiff.

■■ Although neither Davinroy nor the Hospital addressed it, the threshold issue here is whether *Kotecki* applies to cases in which trial had concluded when it was issued. The trial in this case concluded on February 27, 1990. The *Kotecki* opinion was filed April 18, 1991. *Kotecki* held that when an employer is sued as a third-party defendant, the employer is not liable in contribution for any amount in excess of the employer's statutory liability under the Workers' Compensation Act. (*Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d at 165, 585 N.E.2d at 1028.) The *Kotecki* opinion did not say whether its application would be prospective or retroactive.

As a general rule, a decision will be applied retroactively unless the court expressly declares that the decision is a clear break with

past precedent or practice. (*Pierce v. Tee-Pak, Inc.* (1990), 196 Ill. App. 3d 544, 547, 553 N.E.2d 1104, 1106.) Prospective application has been given to both substantive and procedural changes. See *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437 (adopting the doctrine of contribution among joint tortfeasors); *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886 (adopting pure comparative negligence); *Elg v. Whittington* (1987), 119 Ill. 2d 344, 518 N.E.2d 1232 (holding that the 30-day time limit during which to perfect an appeal after a Rule 304(a) (134 Ill. 2d R. 304(a)) finding was from the date of the finding).

The test for prospective application first asks whether the rule establishes a new principle of law, either by overruling clear past precedent or by deciding an issue of first impression that was not clearly foreshadowed. If the answer is yes, then the question of prospective application is answered by considering (1) whether given the purpose and prior history of the rule, its operation will be retarded or promoted by prospective or retroactive application, and (2) whether prospective application is mandated by a balance of the equities. *Castaneda v. Illinois Human Rights Comm'n* (1989), 132 Ill. 2d 304, 329, 547 N.E.2d 437, 448-49.

The First and Third District Appellate Courts used these principles to consider whether *Kotecki* should apply prospectively and reached different conclusions. (*Norberg v. Centex Homes Corp.* (1993), 247 Ill. App. 3d 267; *Kocik v. Commonwealth Edison Co.* (1993), 242 Ill. App. 3d 679, 610 N.E.2d 766.) In *Norberg*, the First District concluded that the supreme court recognized that *Kotecki* changed existing law. (*Norberg*, 247 Ill. App. 3d at 272.) In support of its conclusion, *Norberg* cited the supreme court's discussion of *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, and its holding that the reasoning in *Alvis* concerning legislative inaction and changes in the law was " 'equally applicable here, where the "change" concerns how this court reconciles two, potentially conflicting, statutes.' " (*Norberg*, 247 Ill. App. 3d at 272, quoting *Kotecki v. Cyclops Welding Corp.* (1991), 146 Ill. 2d 155, 162, 585 N.E.2d 1023, 1026.) The *Norberg* court concluded that retroactive application of *Kotecki* to cases tried before *Kotecki* was filed would create a hardship or an injustice to the third-party plaintiffs in those actions. (*Norberg*, 247 Ill. App. 3d at 273.) Consequently it held that *Kotecki* "applies only to cases in which trial had not yet commenced on the date the *Kotecki* opinion was released." *Norberg*, 247 Ill. App. 3d at 273.

*Kocik v. Commonwealth Edison Co.* held that *Kotecki* was retroactively applicable to causes of action which accrued before the *Kotecki* decision was filed. *Kocik* stated that it was not inconsistent with *Norberg* because *Norberg* held that *Kotecki* should not be applied to any case *tried* before April 18, 1991, and none of the nine cases involved in *Kocik* would be tried before that date because they were all on appeal on pretrial motions. *Norberg* concluded that applying *Kotecki* retroactively to cases tried before April 18, 1991, would be unfair to third party defendants who may have made tactical decisions based on the pre-*Kotecki* state of the law. Since these unfair results would not be imposed upon newly filed cases, such as those before it, *Kocik* was not presented with the same issue as was *Norberg*. Thus, *Kocik*'s conclusion of consistency is correct because of the timing of the matters presented to the two districts. It appears, however, that there may be a more fundamental disagreement between the two districts which may not be definitely resolved until the *Kocik* court is presented with the question of whether *Kotecki* applies to a case tried before it was decided.

This court is presented with that question, and we agree with the analysis of the first district in *Norberg* that *Kotecki* should not be applied to cases tried before April 18, 1991. We further agree with the first district's conclusion that *Kotecki* was a case of first impression that was not clearly foreshadowed by *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 461 N.E.2d 382. (*Norberg*, 247 Ill. App. 3d at 272.) A historical examination of the purposes and the interpretation of the exclusive remedy provisions of Illinois' workers' compensation law supports the conclusion that *Kotecki* established a new principle of law.

The present Workers' Compensation Act was enacted in 1951. It followed the compensation acts of 1911 and 1913. To a large extent, the 1951 Act reenacted the provisions of the 1913 Act. (Ill. Ann. Stat., ch. 48, par. 138.1 *et seq.*, at 341 (Smith-Hurd 1986) (now 820 ILCS Ann. 305/1 *et seq.*, at 115 (Smith-Hurd 1992)).) These workers' compensation acts substituted an entirely new system of rights, remedies and procedures for the preexisting common law rights and liabilities between employers and employees for injuries arising out of and in the course of employment. Under the Act, the employee gave up his or her common law right to sue the employer in tort. Recoveries for injuries arising out of and in the course of employment became automatic without regard to fault. The employer gave up the right to plead many of the common law defenses and was compelled to pay some amount. However, the employer's responsi-

bility was fixed under a strict comprehensive scheme. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 180, 384 N.E.2d 353, 356.) "This trade-off between employer and employee promoted the fundamental purpose of the Act, which was to afford protection to employees by providing them with prompt and equitable compensation for their injuries." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d at 180-81, 384 N.E.2d at 356.

The Act replaced the negligence system as the basis for injured employees' compensation for injuries arising out of and in the course of their employment. Nowhere, however, does it appear that the Workers' Compensation Act was meant to abrogate the traditional fault-based system that existed between employers and third parties. In fact, given the paucity, at the time, of third party suits of the kind represented by the instant case, it is quite probable that third-party actions against the employer were not even contemplated when sections 5 and 11 of the Workers' Compensation Act were drafted.

Simply put, the Workers' Compensation Act, and its exclusive remedy provisions, was a legislative bargain between employers and employees. The bargain was not between the employer and a co-tortfeasor third-party. Therefore, the terms of the bargain, including the setoff and the exclusive remedy provisions of sections 5 and 11, were not historically applicable to this relationship.

Evidence that these provisions did not contemplate a limitation of an employer's liability to a co-tortfeasor to the employer's statutory obligation to the employee is found in an examination of an employee's right to sue a third party at the time the Act was enacted. Other evidence supporting the conclusion that *Kotecki* was a substantial change in the law is gleaned from an examination of the doctrine of indemnification in the context of workers' compensation.

When the Workers' Compensation Act was enacted, suits by employees against a third party ultimately responsible for the injury were possible, but not prevalent. An injured employee could bring suit against a third party if the third party's negligence directly contributed to the injury. (2B A. Larson, Workmen's Compensation, §76.12 (1993).) With the exception of Structural Work Act cases, third-party actions did not become common until the expansion and rapid development of products liability law. See 2B A. Larson, Workmen's Compensation §76.12 (1993).

At the time the first Illinois workers' compensation act was passed in 1911, the principles of indemnity were well recognized. (See *Skinner v. Reed-Prentice Division Package Machinery Co.*

(1977), 70 Ill. 2d 1, 7, 374 N.E.2d 437, 439 (citing the history of contribution and the concept of indemnity as discussed in *Merryweather v. Nixan* (1799), 101 Eng. Rep. 1337, 8 Term. R. 186).) Thus, throughout the history of the Workers' Compensation Act in Illinois, the possibility existed for an employee with a compensable injury to collect workers' compensation benefits, to sue a third party for the same injuries and for the third party to seek indemnification from the employer. *Miller v. De Witt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630, definitively approved this procedure.

In *Miller*, the supreme court held that a third-party plaintiff could seek indemnification from an allegedly actively negligent employer even though the employer was also liable to the employee under the workers' compensation statute. (*Miller v. De Witt*, 37 Ill. 2d at 288-89, 226 N.E.2d at 640.) The *Miller* court dismissed the employer's argument that under sections 5 and 11 of the Workers' Compensation Act, it could not be liable for more than the statutory benefits it owed its employee. (*Miller v. De Witt*, 37 Ill. 2d at 288-89, 226 N.E.2d at 640.) Acknowledging that the question was a difficult one, the court held that a passively negligent third party could obtain indemnification from an actively negligent employer. (*Miller v. De Witt*, 37 Ill. 2d at 288-89, 226 N.E.2d at 640.) This is the correct result, the court observed, because the ultimate burden falls on the actively negligent party. *Miller v. De Witt*, 37 Ill. 2d at 289, 226 N.E.2d at 641.

Then came *Skinner, Doyle* and *Kotecki. Skinner* recognized that all or nothing indemnity was inequitable and adopted the concept of contribution among jointly negligent tortfeasors. (*Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437.) *Skinner* also noted that the fact that the employee's action against the employer is barred by the Workers' Compensation Act would not preclude the manufacturer's third-party action against the employer for indemnification and should not serve to bar the action for contribution. (*Skinner v. Reed-Prentice Division Package Machinery Co.*, 70 Ill. 2d at 15-16, 374 N.E.2d at 443.) *Skinner* was codified by the Contribution Act (Ill. Rev. Stat. 1991, ch. 70, par. 301 *et seq.* (now, as amended, 740 ILCS 100/1 *et seq.* (West 1992))).

*Doyle* held that under the Contribution Act, an employer could be liable to a third party for its *pro rata* share of damages as measured by its negligence, regardless of the provisions in sections 5(a) and 11 of the Workers' Compensation Act. (*Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 461 N.E.2d 382.) *Doyle* noted that its decision did not

address the extent to which any right of contribution from the employer under the Contribution Act might impact upon the employer's right of recoupment under section 5(b) of the Workers' Compensation Act. (*Doyle v. Rhodes*, 101 Ill. 2d at 14-15, 461 N.E.2d at 388-89.) *Doyle* invited attention to section 5(b) and cautioned that some accommodation might be required.

We disagree with the implication in *Kocik*, if indeed it is such, that *Doyle* foreshadowed the result in *Kotecki*. *Kocik* states:

> "In *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 14, 461 N.E.2d 382, 388, the supreme court held that an employer could be liable for contribution to a third party, regardless of the immunity provided by sections 5(a) and 11 of the Workers' Compensation Act (Ill. Rev. Stat. 1991, ch. 48, pars. 138.5(a), 138.11). The supreme court did not address the question of the extent of this liability. However, the court did state in *dicta* that 'some accommodation' between section 5(b) of the Workers' Compensation Act (Ill. Rev. Stat. 1991, ch. 48, par. 138.5(b)) and section 2(a) of the Joint Tortfeasor Contribution Act (Contribution Act) (Ill. Rev. Stat. 1991, ch. 70, par. 302(a)) 'may be in order.' *Doyle*, 101 Ill. 2d at 15, 461 N.E.2d at 389." *Kocik*, 242 Ill. App. 3d at 681-82.

Our disagreement with such an implication has two bases. First, section 5(b) deals with the employer's right to recoup the compensation paid under the Act when the injury or death which triggered compensation was caused under circumstances which created a legal liability for damages on the part of some third party. This section requires the employee to notify the employer of the suit, allows the employer to join in the suit and requires the employer to bear a portion of the suit's expense. It also allows the employer to institute these proceedings if the employee does not. (Ill. Rev. Stat. 1991, ch. 48, par. 138.5(b) (now 820 ILCS 305/5(b) (West 1992)).) Section 5(b) does not deal with the abrogation of the common law or statutory rights to sue the employer (Ill. Rev. Stat. 1991, ch. 48, par. 138.5(a) (now 820 ILCS 305/5(a) (West 1992))) or with the measure of responsibility of the employer (Ill. Rev. Stat. 1991, ch. 48, par. 138.11 (now 820 ILCS 305/11 (West 1992))).

Second, *Kotecki* rejects such an implication:

> "As the court noted in *Doyle*, 'some accommodation' between the Contribution Act and the Workers' Compensation Act will be necessary in the future. (*Doyle*, 101 Ill. 2d at 15.) Contrary to Cyclops' suggestion, *'the question as to whether or not there is a limit on the amount that an employer may*

*be found liable for, was not answered in Doyle.'* " (Emphasis added.) *Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d at 162, 585 N.E.2d at 1026.

*Kotecki*, however, considered *Miller* and other indemnity cases of "no help" and noted that the difference between contribution and indemnity is distinct and meaningful. (*Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d at 161, 585 N.E.2d at 1027.) While the difference between contribution and indemnity may be both distinct and meaningful, it is also true that in the workers' compensation context, the practical results of these two doctrines are very similar. *Miller* allowed the burden of the entire judgment to be shifted to an actively negligent employer, which forced the third-party defendant-employer to bear more than its statutory responsibility for its employee's injury. (*Miller v. De Witt* (1967), 37 Ill. 2d 273, 289-91, 226 N.E.2d 630, 640-41.) *Doyle* shifted only a portion of the judgment in the employee's tort action to the third-party defendant-employer, but this portion could easily be in excess of the employer's statutory liability under the Workers' Compensation Act. For purposes of the relationship between third-party actions and the amount the employer might be required to pay, the only difference between *Miller* and *Doyle* was that a successful third-party plaintiff under *Miller* shifted the entire burden to the employer, while, under *Doyle*, only the appropriate *pro rata* share would be shifted. Neither *Miller* nor *Doyle*, however, imposed any limitation based upon the exclusivity provisions of sections 5(a) and 11 of the Workers' Compensation Act.

The foregoing analysis has hopefully established that reliance upon *Miller*'s approval of the transfer of the entire burden of responsibility to the employer by an indemnity action would have been reasonable given the state of the law pre-*Kotecki*. What would or could have been the results of such reliance? First, while no poll has been conducted on the prevalence of reliance on *Miller* before *Kotecki*, it is submitted that the great majority of trial lawyers engaged in personal injury litigation discerned no difference in the treatment of third-party actions *vis-a-vis* worker compensation limitations, regardless of whether the actions were based on indemnity or contribution.

> "The court's opinion suggests that the trial bar and the bench have misinterpreted *Doyle*. Since 1984, thousands of cases have been settled and tried to verdict with employers both waiving the lien and paying 'fresh money' and trial courts dismissing out of hand the argument that the Workers'

Compensation Act is the exclusive remedy against a motion brought by third-party defendant employer.

\* \* \*

\*\*\* [B]oth the bench and bar have interpreted *Doyle* to allow recovery against the third-party defendant employer for its percentage of responsibility under a comparative fault system subject to its Workers' Compensation Act lien rights." Smith, *Defense Lawyer's Perspective on Kotecki*, vol. 36, No. 6 ISBA Trial Briefs 6 (1991).

"As reported in the June 1991 edition of *Trial Briefs*, the Illinois Supreme Court has drastically limited the liability of an injured plaintiff's employer who is joined as a third-party defendant. *The practice of trial courts had been to permit contribution against employers to the full extent of the employers' contribution liability* as judged by the jury." (Emphasis added.) Enright, *More on Kotecki: Arguments to Maximize Employer's "Contribution" to Settlement or Judgment*, vol. 37, No. 2 ISBA Trial Briefs 1 (1991).

See also Fegan, *Illinois Supreme Court Limits Contribution Against Employers*, Vol. 1, No. 1 Ill. Def. Couns. Q. 3 (1991).

Second, the reliance on *Miller* could adversely affect any of the parties to such litigation. *Norberg* furnished an illustration of a possible adverse effect on a direct defendant who might have chosen not to file a third-party action against the employer if it had known that its recovery would be limited to the latter's workers' compensation liability. Of equal, or of perhaps greater, importance than the tactical decision of joinder of the third-party defendant-employer would be the settlement negotiations that occurred in cases approaching trial just before *Kotecki*. In scaffold act cases it is commonly, although not universally, true that the third-party defendant-employer is the most culpable, whether that culpability is based on indemnity or contribution. Consequently, employers would routinely waive their workers' compensation liens and contribute significant amounts toward settlement of the underlying action. The same situation prevailed when the underlying action was based on product liability and the employer had modified the product or perhaps required it to be used in a hazardous manner. The settlement posture of every case approaching trial changed dramatically when *Kotecki* was decided.

"The future of thousands of settlements involving third-party contribution actions remains uncertain \*\*\* as a result of an

important ruling on Thursday by the Illinois Supreme Court, according to personal injury lawyers.

\* \* \*

Jay H. Tessler, president of the International Association of Defense Counsel, said that if employers *now know* they cannot be held liable beyond that which they have already paid out in compensation, they may not offer any additional money to help settle the case." (Emphasis added.) (Renee Cordes, *High Court Ruling May Reduce Employers' Willingness to Settle*, Chicago Daily Law Bulletin, April 19, 1991, at 1.)

Just what effect the decision might have on each one of the parties would depend upon the facts of each case and the legal theories supporting the various parties' positions, but it is clear that the change could be harmful to any one or more of them. (For an interesting discussion of possible future problems under *Kotecki*, see Broom, *Making Kotecki, Contribution and Apportionment Work Together*, Vol. 3, No. 1 Ill. Def. Couns. Q. i (IDC Monograph 1993).)

Litigants whose trials concluded before *Kotecki* was filed had no opportunity to consider *Kotecki*'s implications while planning their trial strategy. Consequently, it would be inequitable to apply *Kotecki*'s rule to cases in which trial had concluded on the date *Kotecki* was issued. In the instant case, the rule announced in *Kotecki* is not applicable because the trial was concluded more than a year prior to the *Kotecki* decision.

The jury assessed Davinroy's liability at 80%. This assessment is supported by the evidence. For the above reasons, the jury's verdict awarding plaintiff $340,000 and assigning 20% of the liability to the Hospital and 80% of the liability to Davinroy is affirmed.

Affirmed.

MAAG, J., concurs.

JUSTICE RARICK, dissenting:

Because I believe the closing argument of plaintiff's counsel overstepped the bounds of propriety and the cumulative effect of counsel's prejudicial comments deprived the defendants of a fair trial, I must dissent. The purpose of closing argument is to assist the jury in arriving at a verdict, with all facts presented fairly. (*Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656,

661, 315 N.E.2d 63, 67.) Here, neither the facts nor reasonable inferences drawn from those facts were presented fairly.

While it is not improper for counsel to question either the credibility or judgment of a witness upon any legitimate ground, counsel "has no right to indulge in violent or inflammatory language for the purpose of arousing the prejudice and passions of the jury nor to insult or abuse a witness without cause." (*Regan v. Vizza* (1978), 65 Ill. App. 3d 50, 53, 382 N.E.2d 409, 411.) "The constitutional right of trial by jury is not a license to counsel to indulge in abusive and prejudicial conduct to gain a verdict ***." (*Cecil v. Gibson* (1976), 37 Ill. App. 3d 710, 712, 346 N.E.2d 448, 449.) A trial should be a dignified procedure, not something which demeans the entire judicial process. Counsel's comments here were far more than "colorful"; in many instances, they served only to arouse the prejudice and passions of the jury. Moreover, we are not confronted with just a few isolated remarks; the entire tenor of the argument clearly was designed to arouse the emotions of the jury. I again wish to reiterate, as I did in my dissent in *Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 576 N.E.2d 918, that while zealous advocacy should be encouraged, even zealous advocacy must fall within reasonable bounds of propriety. Plaintiff's counsel here overstepped that boundary.

I have no problem with counsel arguing that the opposing side's expert witness is distorting the truth for personal gain; my concern is the language used to express that belief. Contrary to the views of the majority, it is not a matter of "coddling" the expert witness; it is a matter of dignity and respect for the entire judicial process. Winning at any cost simply should not be tolerated.

Additionally, I wish to express my concern over the potential for abuse we possibly are creating by allowing the use of nonparty medical records. While I ultimately concur with the majority's disposition of this issue, I strongly urge trial courts to proceed with great caution in future cases if faced with similar circumstances.